IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

A.D. SMITH, ET AL.,

                    Plaintiffs,

  v.                                      No. 2:89CV00036 SWW

BOARD OF EDUCATION, PALESTINE-            September 20, 2012
WHEATLEY SCHOOL DISTRICT, ET AL.,         Little Rock, Arkansas
                                          10:05 a.m.
                    Defendants.

**TRANSCRIPT OF HEARING**
BEFORE THE HONORABLE SUSAN WEBBER WRIGHT,
UNITED STATES DISTRICT JUDGE


APPEARANCES:

On Behalf of the Plaintiffs:

    MR. JOHN WALKER, Attorney at Law
      1723 Broadway
      Little Rock, Arkansas  72206-1220

    MR. SCOTT RICHARDSON, Attorney at Law
      Arkansas Attorney General's Office
      323 Center Street, Suite 200
      Little Rock, Arkansas  72201-2610

On Behalf of the Defendants:

    MR. GEORGE JAY BEQUETTE, Attorney at Law
      Bequette & Billingsley
      425 West Capitol Avenue, Suite 3200
      Little Rock, Arkansas  72201-3469




    Proceedings reported by machine stenography and displayed

in realtime; transcript prepared utilizing computer-aided

transcription.


Cheryl Nelson Kellar, RPR, CRR, CCR
United States Court Reporter

**I N D E X**

| WITNESSES FOR DEFENDANTS: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| JON ESTES | 5 | 47 | 124 | |
| HAZEL BURNETT | 126 | 131 | 139 | 140 |

WITNESSES FOR PLAINTIFFS:

| DEBBIE LOEWER | 149 |
|---|---|

* * * * * * *

EXHIBITS:                                                                RECEIVED

Defendants' Exhibits 1 through 16.......................P.  145

* * * * * * *

|   |   |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | THE COURT:  Good morning.  This is a hearing on a |
| 3 | motion in a case filed Smith, et al. v Palestine-Wheatley, et |
| 4 | al.  This case is one of our older cases, and we are here |
| 5 | because the defendants have filed a motion to modify or |
| 6 | terminate the consent decree.  Let the record reflect that the |
| 7 | defendants are represented by Mr. Jay Bequette. |
| 8 | And who is at your table, Mr. Bequette? |
| 9 | MR. BEQUETTE:  Jon Estes, the superintendent of |
| 10 | Palestine-Wheatley School District. |
| 11 | THE COURT:  All right.  Good morning. |
| 12 | And Mr. John Walker is here representing the plaintiffs in |
| 13 | the matter, who are in opposition to the motion. |
| 14 | MR. WALKER:  Yes, ma'am. |
| 15 | THE COURT:  And I know Joy Springer who is at your |
| 16 | table. |
| 17 | MS. SPRINGER:  Yes, ma'am. |
| 18 | THE COURT:  I don't know you. |
| 19 | MR. RICHARDSON:  I am Scott Richardson with the |
| 20 | Attorney General's office, representing the department against |
| 21 | the state board, who is actually a plaintiff.  We were added as |
| 22 | a plaintiff, I think by Judge Woods in 1990. |
| 23 | THE COURT:  See, I didn't even know that.  Were you |
| 24 | in -- we have had other hearings in this matter.  Were you |
| 25 | present? |

1    MR. RICHARDSON:  I am sure someone from the Attorney

2   General's office was there, but since 2007, I have been the

3   attorney assigned to the education matters in the office.  And

4   I handle desegregation matters as well, including the

5   Little Rock case.  So when this hearing came up, when this

6   pleading came up, it fell to me to defend it, so I get to spend

7   the day with you.

8    THE COURT:  Okay.  Maybe even longer.  I don't know.

9    Now, there is also a request from Mr. Walker, and he

10   renewed it in a letter to the Court yesterday, that he be

11   permitted to undertake discovery.  And one reason I wanted to

12   have this hearing is really to determine whether I should grant

13   that request, Mr. Walker, and if so, how I should -- whether

14   discovery should be limited in some way.  And so that is one

15   reason we went ahead with it.

16    I am trying to give some priority to this case because I

17   am mindful that school years and calendars are things that the

18   parties have to consider, and I am mindful that the

19   plaintiff -- excuse me -- the defendants are alleging changed

20   conditions.  And I just wanted to get started and that -- I am

21   not denying right now your request for discovery.  I just

22   decided I am going to try to see what the nature of the

23   defendants' case is, and maybe we can -- maybe you can decide

24   what kind of discovery you want and I can decide whether I

25   should give that to you or just decide the case on the law.

1   And so that -- that's really the reason that I proceeded to

2   have this hearing quickly.

3           MR. WALKER:  Yes.  That's fine, your Honor.

4           THE COURT:  All right.  The burden is on the

5   defendants and, of course, Mr. Bequette is prepared to go

6   forward.

7           MR. BEQUETTE:  Yes, Your Honor.

8           THE COURT:  And you may call your first witness.  Now,

9   if you want to say anything in -- make a prefatory statement,

10  you may.  I do understand some of your arguments because I

11  reviewed the motion and brief.

12          MR. BEQUETTE:  Thank you, Your Honor.  I will just

13  allow my papers we filed in the case, the initial motion and

14  reply, to speak for itself.

15          THE COURT:  Sure.  You may call your first witness.

16          MR. BEQUETTE:  We will call Jon Estes.

17          THE COURT:  Mr. Estes, I will need to swear you

18  before -- the witness stand is right there, and I will swear

19  you.

20          **JON ESTES, DEFENDANTS' WITNESS, DULY SWORN**

21          THE COURT:  Please be seated.

22                       DIRECT EXAMINATION

23  BY MR. BEQUETTE

24  Q    Good morning, sir.  Would you identify yourself for the

25  record, please.

1    A      Jon Estes.

2    Q      And how are you employed?

3    A      Superintendent, Palestine-Wheatley School District.

4    Q      And how long have you been the superintendent of

5    Palestine-Wheatley?

6    A      Going on 14 months.

7    Q      I see.  And you were hired effective what date?

8    A      July 1, 2011.

9    Q      If you would, give the Court a sense of your educational

10   and work background beginning with college.

11   A      I have got an educational specialist degree from Henderson

12   State University, master's degree in educational administration

13   from University of Southern Mississippi, bachelor's degree in

14   history from Texas A&M University-Texarkana, and an associate's

15   degree from Texarkana College.

16   Q      And work history after college?

17   A      Work history after college, I coached softball and taught

18   social studies and did ALE at Bradley High School in Bradley,

19   Arkansas.  I left there around 2004, right after Act 60 of

20   2003.  I left there and went to Drew Central and coached

21   baseball, taught social studies there, served as department

22   head of the social studies department 2004 to 2008.  Left there

23   to get into administration in Palestine-Wheatley High School

24   where I served as high school principal three years before

25   being hired as superintendent.

```
1    Q    Do you have an exhibit packet in front of you?

2    A    Yes, sir.

3              MR. BEQUETTE:  Judge Wright, does the Court have an

4    exhibit packet?

5              THE COURT:  I believe I have one that you sent.

6              MR. BEQUETTE:  On Monday, I sent it, pursuant to the

7    Court's order.

8              THE COURT:  You may use it, Cheryl.

9         If there is something I don't have -- I am looking at the

10   order that -- the Court's order.

11   BY MR. BEQUETTE

12   Q    Could you turn to -- can you turn to Exhibit 1 in the

13   district's exhibit packet?

14   A    Yes, sir.

15   Q    Can you identify that for the record, please?

16   A    That -- that is board meetings from February 13 of 2012.

17   Q    Was there any action taken by the board relative to asking

18   the Court to pursue release from the consent decree in this

19   case or modification of that consent decree?

20   A    Yes, sir.  A motion was made by -- it says underneath

21   Section C:  Motion was made by Derrick Boileau and seconded by

22   Jared Parker giving Mr. Estes permission to pursue the release

23   or a modification of the federal court order and roll call,

24   yes.

25   Q    All right.  And what was that -- what was the vote on that
```

1  motion?

2  A    Six to one.

3  Q    Who voted against that motion?

4  A    Mr. Gary Caldwell.

5  Q    And what zone does Mr. Caldwell represent?

6  A    I think Zone No. 2, but it is the north side of Wheatley

7  and goes to the north side of Palestine.

8  Q    I see.  And what's Mr. Caldwell's race?

9  A    White.  He is Caucasian.

10 Q    Okay.

11       MR. BEQUETTE:  Your Honor, Exhibit 2 is kind of going

12 to lead in to our next exhibit.  Exhibit 2 is an evidentiary

13 deposition that was taken of a demographer, Mr. James Walden.

14 BY MR. BEQUETTE

15 Q    Can you -- do you know James Walden, Mr. Estes?

16 A    No -- I have done business with him, maybe talked to him

17 on the phone and e-mailed him.  I wouldn't know him if he

18 walked through the door.  I never have seen him.

19 Q    You have talked to him on the phone and have exchanged

20 e-mails with him?

21 A    Yes.

22 Q    What does Mr. Walden do, to your knowledge?

23 A    He is a demographer.  I know he sets school zones for

24 board elections.

25 Q    Pursuant to the Voting Rights Act?

1   A      Pursuant to the Voting Rights Act.

2            THE COURT:  I know there is an objection.

3            MR. WALKER:  Yes, Your Honor.  We will file the

4   objection and document itself before you as an evidentiary

5   deposition.  It sets forth that Mr. -- the gentleman is not a

6   demographer and he -- we sought to participate in the

7   deposition before you on the information that he was a

8   demographer.  And during the deposition he indicated that he

9   was not an expert, he had no familiarity of -- no expert

10  qualifications.  So we do not believe that this document

11  that -- or at least this evidentiary deposition should be

12  admitted.

13       We do not object to this witness talking about what he did

14  and with whom he did it, but we would not like to have him

15  established as a demographer simply because this gentleman says

16  he was.

17           THE COURT:  You are not objecting to the question

18  right now?

19           MR. WALKER:  No, ma'am.  No.

20           THE COURT:  This is the way I intend to handle the

21  deposition.  I am going to let Mr. Bequette go ahead with it.

22  This is a trial to the Court; there is no jury.  And then later

23  on I can decide whether I am going to recognize this person as

24  competent to testify about the demographics of the

25  Palestine-Wheatley School District.

1      And by the way, the exhibits I have are those that were

2  attached to your motion.

3            MR. BEQUETTE:  Yes, Your Honor.

4            THE COURT:  And so they are numbered differently and

5  all -- which is fine.  I just don't have the packet up there,

6  but I will make sure I get one before the hearing is over.

7            MR. BEQUETTE:  Yes, Your Honor.  And just by way of

8  response, we're not holding Mr. Walden out to be an expert.  We

9  are simply using Mr. Walden to authenticate Exhibits 3, 4, and

10  5, which were compiled by Mr. Walden using publicly available

11  information from the U.S. Census Office and the Arkansas

12  Geographical Office.

13            THE COURT:  The objection is preserved for the record.

14  You are going to get it in, but actually, the issue is whether

15  he is competent to testify concerning these matters.

16            MR. BEQUETTE:  Well, all Mr. Walden's testimony is,

17  when the Court reviews his deposition, the Court will note that

18  all his testimony is to authenticate that he compiled it using

19  that --

20            THE COURT:  I understand.

21  BY MR. BEQUETTE

22  Q    And what was the purpose for Mr. -- or did the district

23  engage Mr. Walden?

24  A    Yes, sir.  I contacted Mr. Walden with a need to rezone

25  our -- to check first to see if our board zones were in

1    compliance with the federal law concerning a 10 percent

2    variation in population.  He told me that we were not in

3    compliance with --

4              MR. WALKER:  Objection.

5    BY MR. BEQUETTE

6    Q    You can't testify to hearsay, to what he told you.

7    A    Yes.  We did engage him.

8    Q    I see.  And then can you turn to Exhibit No. 3,

9    Defendants' Exhibit No. 3?

10   A    Yes.

11   Q    What is this?

12   A    At a later date, I -- we started looking into this thing

13   with Wheatley.  It wasn't any kids over there.  There wasn't

14   any kids coming, and when we looked at the old federal court

15   order, I looked at it, and I seen where Judge Wright had --

16   part of her ruling was that does not want to disenfranchise the

17   African-American children who lived in Wheatley.  Well, I drove

18   buses at Palestine.  I do whatever needs to be done at

19   Palestine, in the school district, and Wheatley.  And I could

20   see -- I knew where the kids lived at, and I knew that the

21   majority of the population of African-American children did not

22   live closer to the Palestine campus than the Wheatley campus.

23   So I asked him to verify my assumptions and make them out, and

24   that's what he did.

25   Q    So what is Exhibit 3?

1    A    It is a population map showing where the greater

2    concentrations of African-Americans live within the

3    Palestine-Wheatley School District.

4    Q    And what does this map, Exhibit 3 --

5         MR. WALKER:  I object unless this witness can

6    authenticate that he has personal knowledge of it.

7         THE COURT:  He said he drove the school bus.

8         MR. WALKER:  He hasn't indicated that this map was

9    prepared by him or that the contents or that what is before the

10   Court in this exhibit have been validated by him.  He is saying

11   that somebody told him something, but he has not established

12   himself.

13        THE COURT:  I am overruling your objection and I am

14   going to receive it, but he -- you may, of course,

15   cross-examine him.  He is not only the superintendent, but he

16   says he drives the bus sometimes.  He does what's necessary in

17   a small school district like that, and he has some personal

18   knowledge about where these children live.  You can

19   cross-examine him.  I admit, he did not prepare the map.

20        Go ahead.

21        MR. BEQUETTE:  That's correct.

22   BY MR. BEQUETTE

23   Q    Mr. Estes, what does this map, Exhibit 3, show you?

24   A    This map shows that the greater number of

25   African-Americans in the Palestine-Wheatley School District

1    live closer to the Palestine campus than the Wheatley campus.

2    Q    Turn to Defendants' Exhibit No. 4.  What is Exhibit No. 4?

3    A    A total population map of the Palestine-Wheatley School

4    District.

5    Q    And what does this map show you?

6    A    This map shows that the greater number of -- the greatest

7    number of concentration of the population, entire population,

8    lives closer to the Palestine campus than the Wheatley campus.

9    Q    Now, is it -- what kind of percentage of students live --

10   or that have a Wheatley address?

11   A    Going on 57 students.  According to last year's data, 57

12   students had a Wheatley address.

13   Q    And how many students do you have?

14   A    696 pre-kindergarten through 12th grade students.  57 had

15   a Wheatley address.

16   Q    What is the town of Goodwin?

17   A    A midway point between Palestine and Wheatley.

18   Q    And how many students does the district have that live in

19   Goodwin?

20   A    If my -- if I remember correctly, it's about 21 or 23

21   students live in Goodwin.

22   Q    Okay.  And then what are the, what's the racial

23   composition of the town of Goodwin to your recollection?

24   A    The racial composition of the town of Goodwin is

25   predominantly black.

1   Q     And what is the racial composition of Wheatley?

2   A     About 73 percent white.

3   Q     And what's the African-American population percentage?

4   A     About 25, 28 percent.

5   Q     And then what about -- give us the same breakdown on

6   Palestine.

7   A     Palestine is about 79 percent white and about 20 percent

8   black and about 1 percent other, I guess.

9   Q     All right.  Then could you turn to Defendants' Exhibit No.

10  5, please?

11  A     Yes.

12  Q     What is the first page of Defendant's Exhibit No. 5?

13  A     The -- the overview of the demographic report of existing

14  board zones.

15  Q     And how did -- did it depict a variance?

16  A     Yes.  A wide variance between the demographics of the

17  board zones.

18  Q     And --

19  A     Population of the board zones.

20  Q     And what action has the district taken in response to

21  receiving this demographic report regarding the existing board

22  zones?

23  A     Because the federal law, in keeping with the federal law,

24  in compliance with the federal law, we had to redraw our board

25  zones.

1    Q     Now, could you turn to the last page of Exhibit 5?

2    A     Yes.

3    Q     What is this?

4    A     This is the board zones as they are right now.

5    Q     So these are the current board zones?

6    A     Yes.

7    Q     And what's going to happen to these zones after the

8    election?

9    A     After the election, after we have another meeting, these

10   board zones will -- they -- everybody who ran had to run for a

11   different zone.  These zones are changing.

12   Q     I see.  Now I would like you to turn to --

13            THE COURT:  Just a minute.  I want to find out whether

14   I have the last page of Exhibit 5.  Is that correct?

15            MR. BEQUETTE:  Yes, Your Honor.  It's this color page

16   right here.

17            THE COURT:  All right.

18            MR. BEQUETTE:  I will put it on the screen.

19            THE COURT:  And those are the redrawn zones?

20            THE WITNESS:  No, ma'am.

21            MR. BEQUETTE:  These are existing.

22            THE COURT:  All right.  Thanks.

23   BY MR. BEQUETTE

24   Q     Now, what I would like to do is refer you next to Exhibit

25   No. 6 and this is the -- a joint motion that was filed

1    August 3, 1990, asking the Court to approve and implement a

2    single-member district election system in the district; is that

3    correct?

4    A    Yes, sir.

5    Q    Now about four pages over, there is a map, which is

6    Exhibit 1 to the motion?

7    A    Yes, sir.

8    Q    Let me put this on the screen.  Now, I would like you to

9    compare the map that was attached to the 1990 motion to the

10   last page of Exhibit 5.  And I think we have got -- I have got

11   these real fancy-dancy blowups, but here it is right here.

12   A    That's the last page of Exhibit 5.

13   Q    That's correct.  Can you compare the two?

14   A    They are exactly the same.

15            THE COURT:  All right.  Just a minute.

16        Mr. Walker, would you come up here just one moment,

17   please, and Mr. Bequette, you too.

18        (Discussion off the record.)

19   BY MR. BEQUETTE

20   Q    Mr. Estes, I am not sure if I heard your answer.  You

21   compared the map depicted in Exhibit 1 to that joint motion

22   from 1990 to the last page of Exhibit 5, which are the existing

23   board --

24   A    They are the same.

25   Q    They are the same?

1    A     Yes.

2    Q     So from that, you believe the board zones have not changed

3    from 1990 to the present time?

4    A     Yes.

5          THE COURT:  Is it just me or is it kind of warm in

6    here?

7          MR. BEQUETTE:  It is a little warm.

8          THE COURT:  We have to ask GSA to make it colder.

9    That's just a placebo over there on the wall.  It really

10   doesn't work as a thermostat.

11   BY MR. BEQUETTE

12   Q     All right.  Mr. Estes, would you turn to Defendants'

13   Exhibit No. 7?

14   A     Yes.

15   Q     And we want to now kind of move in to, you know, the basis

16   for the district's motion to modify or terminate the decree.

17   What does Defendants' Exhibit No. 7 depict?

18   A     No. 7 depicts the students who are bused from Palestine

19   campus to the Wheatley campus on a shuttle bus.  Shuttle -- the

20   kids ride the bus to school and they go to whichever school

21   they live closer to and then they are shuttled to the school in

22   which they actually attend.

23   Q     And when you are talking about the Wheatley campus, are

24   you referring to the middle school grades -- five, six, seven,

25   and eight?

1    A    Yes.

2    Q    And so how many students are transported from these buses

3    that go from Palestine over to the Wheatley Middle School

4    campus?

5    A    Roughly 170.

6    Q    I see, and how many buses does the --

7    A    Four buses.

8    Q    And these buses run every day?

9    A    Every day, two times a day.

10   Q    Now, turn to Defendants' Exhibit No. 8.  What's

11   Defendants' Exhibit No. 8?

12   A    That shows the kids -- the number of kids who ride from

13   the Wheatley campus, who are shuttled from the Wheatley campus.

14   Q    The Wheatley area?

15   A    Not necessarily the Wheatley area.  They are picked up on

16   routes.  Some of their routes start closer to Palestine, but

17   because of the way the routes run and it is -- they start

18   closer to Palestine.  They have to get bused to Wheatley, and

19   then they have to get bused back to Palestine to go to school.

20   Q    And how many kids ride those buses?

21   A    There is roughly 59.

22   Q    All right.  And how many buses run from Wheatley over to

23   Palestine?

24   A    There is two buses with 59 kids for nine grades.

25   Q    And that's the K, the pre-K through 4 and then grades --

1    A     There is 39 kids for the five grades of pre-K through 4,

2    and there is 20 kids from the high school, 9 through 12.   To

3    put that in perspective, if you look back on Section 7, we bus

4    just as many eighth grade kids for one class from Palestine to

5    Wheatley as we do entire for nine classes from Wheatley to

6    Palestine.   And many of those -- those kids we bus for those

7    nine classes, many of those kids live closer to the Palestine

8    campus to begin with.

9    Q     And why is that?

10   A     That's the way -- because you have to -- you have got a

11   Goodwin route.   Well, there is not any kids that live in

12   Goodwin.   You can't run a single bus for every child.

13   Q     Right.

14   A     You have to, you know, try to even it out.   And the way it

15   was whenever I inherited it, the bus, the one Wheatley bus that

16   picks up the Goodwin kids starts at 2:59, driven by Mr. Leonard

17   McKissic and he has told me -- that's hearsay.

18   Q     You can't talk about hearsay.   Let me ask you a question.

19   A     Yes, sir.

20   Q     If the Court allowed the district to close the Wheatley

21   Middle School campus and move those grades and that campus to

22   the Palestine campus, what would that result -- or what would

23   the district be able to do with regard to student start times

24   for these kids that are being bused from Wheatley to Palestine

25   right now, and how would that affect those students, you know,

1    amount of time they spend on a bus?

2              MR. WALKER:  That's two questions.  I object.

3              THE COURT:  Ask the start times.

4              THE WITNESS:  Start times, kids would be able to get

5    more sleep, get on the bus 45 minutes later than what they have

6    to.  They would get on the bus, go -- go to school, get to

7    school by 7:45 and go eat breakfast, instead of having to get

8    to school by 7:10 or 7:15 to get dropped off to be put on a

9    shuttle bus to be bused 13, 15 miles away.  Every kid in the

10   district, if you did away with Wheatley Middle School, every

11   kid in the district -- there is not one kid who would have a

12   longer bus ride, and most of them would have a shorter bus

13   ride; therefore, increasing their time to sleep and eat

14   breakfast and their time to study and learn and increasing

15   their time for before-school tutoring and after-school

16   tutoring, such as that.

17   BY MR. BEQUETTE

18   Q    I see.  Now, if you can turn to Exhibit No. 9 and identify

19   this exhibit, please.

20   A    This is the enrollment projection for Palestine-Wheatley

21   School District.

22   Q    What is significant about the enrollment projection in

23   Defendants' Exhibit No. 9?

24             MR. WALKER:  Objection, Your Honor, unless this

25   witness can establish that he did this himself.

1          MR. BEQUETTE:  May I respond?

2          THE COURT:  You may.

3          MR. BEQUETTE:  This is a public record generated by

4   the Arkansas Department of Education and, you know, the Court

5   can take judicial notice of the authenticity of this public

6   record.  There is a Friends of Lake View decision where the

7   Eighth Circuit expressly upheld that.

8          MR. WALKER:  That's not right, Your Honor.  This is a

9   document which has no authentication.  It is -- there is

10   nothing to indicate how it was done.  There is no way it can be

11   examined or cross-examined.  Only thing he is submitting it in

12   is as a fact.

13          THE COURT:  I am going to receive it at this point,

14   conditionally.  I don't know what it is.  You may cross-examine

15   about it.

16      But you may proceed.

17          MR. BEQUETTE:  Thank you, Your Honor.

18   BY MR. BEQUETTE

19   Q    What is this document, Mr. Estes?

20   A    It is an enrollment projection dated January 11, 2012, put

21   out by the Arkansas Department of Education.

22   Q    And what does this projection -- or what does this summary

23   project as far as the district's enrollment over the next

24   several years?

25   A    It shows us losing roughly about 140 kids over the next

1    ten years.

2    Q    And translate that to the impact of losing that number of

3    students on the district's annual budgets?

4    A    140 times 6200.  $6200 per kid, that is what the state

5    allots in the funding matrix foundation funding.

6    Q    Mr. Estes, what kind of forward looking planning does a

7    school district like Palestine-Wheatley have to do when it

8    receives an enrollment projection like this that shows the

9    district losing children?

10   A    You need to start cutting.  You need to start preparing at

11   that point in time.

12   Q    And what does it mean to you as a superintendent for the

13   district responsible for -- what's the annual size of the

14   budget for Palestine-Wheatley?

15   A    The budget will be decreasing, so you need to decrease

16   your expenditures.

17   Q    How large is the annual budget this year?

18   A    Roughly a $3 million budget.

19   Q    So the loss of that number of students, would that create

20   a hole?

21   A    Yes.

22   Q    And what does the term "matching expenses to your

23   revenues" mean to you as a superintendent in charge of

24   balancing a budget?

25   A    It needs to be balanced.  It's just like balancing your

1    checkbook or your home business, your home finances.  You can't

2    spend more than you make.  You can't spend more money than you

3    have.

4    Q    Okay.  Now, if you would please turn to Defendants'

5    Exhibit No. 10.  What is the first page?

6    A    The first page is a -- is historical data showing the net

7    legal balance from 2005 to 2011.

8    Q    Now, what does the net legal balance or what some people

9    refer to as the ending fund balance for each of these years,

10   what kind of a trend is that?

11   A    There is a trend of decreasing net legal balance.

12   Q    And is that a problem?

13   A    Yes.  If you don't have money, you can't stay in business.

14   Q    Well, you are not allowed to deficit spend under Arkansas

15   law?

16   A    No, sir.

17   Q    From looking at it, it appears that there are two years

18   where the fund balance did not technically decrease; is that

19   correct?

20   A    Right.  That's true.  In 06-07, it went up $2 million.

21   That's because there was a fire -- the Wheatley gym burned, and

22   there is insurance money off the Wheatley gym.

23   Q    I see.

24   A    A couple of years later, a maintenance man driving a -- I

25   read the report the other day -- had a maintenance man driving

```
 1    lawnmower --
 2              MR. WALKER:  Objection.  That's clearly hearsay.
 3              THE COURT:  It is.  I don't know that it is offered
 4    for truth of the matter asserted.  I am going to let him
 5    explain why that balance -- and I don't care whether it was a
 6    maintenance thing, but if some insurance proceeds make the
 7    balance fat, that's all that matters.
 8              THE WITNESS:  Lawnmower started on fire.
 9    BY MR. BEQUETTE
10    Q    You can't testify about hearsay, but you can just explain
11    as succinctly as you can why the fund balance didn't go down
12    that year.
13    A    In 2008-09, the fund balance, we had $212,000 worth of
14    insurance proceeds from a field house burning down.
15    Q    Okay.  So is that why the ending balance went up in 08-09
16    from 07-08?
17    A    Yes.  And you can also see there that each of these years,
18    we had increasing enrollment up until last year.  Our
19    enrollment started increasing up until last year.  So whenever
20    that enrollment was increasing, your budget should have been
21    going up because you have more kids and more money.  But
22    whenever you have -- you are getting more and more students at
23    roughly $6,000 each and your budget is going down and your
24    ending balance is going down, that doesn't add up.
25    Q    And then there was also a slight increase in the fund
```

1    balance at the end of 2011-2012.  Can you explain that?

2    A    Yes, sir.  It shows a -- about a roughly $100,000

3    increase.  We were -- that was a one-time shot in the arm ARRA

4    money, stimulus money.

5    Q    From the federal government?

6    A    Federal government stimulus money.  Arkansas -- American

7    Recovery Reinvestment Act.  We recovered about $470,000 of that

8    money, and we paid teacher salaries and one thing or another

9    with it.  So we had a $470,000 shot in the arm, but our ending

10   balance only went up $100,000.  So if it wouldn't have been for

11   that one-time shot in the arm, we would have been like the

12   previous years.  We would have went down about $300,000.

13   Q    I see.

14         MR. WALKER:  Let me object to this witness testifying

15   as a fact witness about matters that preceded his employment.

16         THE COURT:  Well, I overrule your objection.  He was

17   not the superintendent, but he was a principal who, as an

18   administrator -- you may cross-examine him, but he was the

19   principal before he was superintendent.  And you may, of

20   course, cross-examine him about his knowledge of the school

21   district budget when he was not superintendent.

22         MR. WALKER:  May I note that he did not come to

23   Palestine-Wheatley until 2008-09.  That was after this --

24         THE COURT:  Well, that's my ruling.  He can -- I am

25   permitting him to testify.  You may, of course, cross-examine

1    and you can ask me not to consider his testimony if you can

2    convince me that it shouldn't be given any weight.

3         Go ahead.

4    BY MR. BEQUETTE

5    Q    Mr. Estes, are the insurance proceeds and the stimulus

6    money, are those recurring revenues or are they non-recurring

7    revenues?

8    A    Those are non-recurring revenues.

9    Q    In other words, you don't expect those?

10   A    We cannot budget for those.  We cannot figure that into a

11   budget and expect it the next year.

12   Q    So would you plan your budget -- would you plan to fund

13   recurring expenses with non-recurring revenues?

14   A    No, sir.

15   Q    Can you turn to Defendant's Exhibit --

16        THE COURT:  I don't know why not.  I have seen other

17   school districts do it.

18        THE WITNESS:  I am trying to keep my job, Judge.

19        THE COURT:  Okay.  Go ahead.

20   BY MR. BEQUETTE

21   Q    Can you please turn to Defendants' Exhibit No. 11, please.

22   A    Okay.

23   Q    Can you identify this?

24   A    Yes.

25   Q    What is it?

1   A    It is a letter from Ms. Hazel Burnett with the Arkansas

2   Department of Education that I received a couple of months

3   after I started working at the district as superintendent,

4   telling me I needed to meet with her concerning our finances.

5   We had triggered early indicators for fiscal distress.

6   Q    And we have Ms. Burnett here to speak to this letter.

7   What did you do in response to receiving this letter?

8   A    I called and made an appointment.  I worked with Debbie

9   and filled out a questionnaire, and then I went and met with

10  Ms. Burnett.

11             THE COURT:  I failed to ask if anyone wanted the rule

12  invoked.

13             MR. WALKER:  Your Honor, we were aware that we could,

14  and we didn't.

15             THE COURT:  All right.

16             MR. BEQUETTE:  No problem.

17             THE COURT:  Go ahead.

18  BY MR. BEQUETTE

19  Q    Tell us about what happened at the meeting.

20             MR. WALKER:  Objection, Your Honor.  That would

21  clearly be hearsay.

22             THE COURT:  What happened at the meeting?

23             MR. WALKER:  With Ms. Burnett.

24             MR. BEQUETTE:  I don't want you to testify as to what

25  Ms. Burnett said.

1          THE COURT:  What happened as a result of the meeting

2   with Ms. Burnett?  What did do you?

3          THE WITNESS:  I went back very much aware that we

4   needed to do something different to stop our declining balance.

5   We was triggered because we had a declining balance a couple of

6   years in a row, and that's one of the triggers that triggers

7   distress.  So our finances were not where they made me aware.

8   I thought the finances were in good shape, but that's one of

9   the things that made me start looking as a young

10  superintendent:  Hey, John, you want to keep your job and you

11  want this district to be here, you better do something.  You

12  got to go to work.  You can't just let it go and hope that it

13  gets better.

14  BY MR. BEQUETTE

15  Q    Is one of the things you have looked at --

16         MR. WALKER:  Objection.  Leading.

17  BY MR. BEQUETTE

18  Q    Okay.  What alternatives did you look at to stem this

19  trend of declining balances?

20  A    One thing I did is I looked at other schools that were

21  successful.  I realized that -- I could not, at the time, find

22  another 2A school in the state of Arkansas that operated three

23  separate campuses in K-4, a middle school, and a 9-12

24  configuration.  Other schools three times the size of us, as in

25  Helena-West Helena, in order to save money, they're cutting

1    their campuses down to a K-6, 7-12 configuration.

2    Q    Are you aware of any other districts that have

3    consolidated campuses in this way?

4    A    Yes.  Forrest City right next to us, 8 miles, they have

5    closed campuses to save money.  Lee County, Marianna, south of

6    us, they have closed campuses to save money.

7              MR. WALKER:  Objection.  This witness cannot testify

8    as to what happened in those places and the reason for it

9    except that's -- that's a belief and it's certainly not factual

10   information.

11             THE COURT:  He may testify that they have closed

12   campuses if he is in a position to know.  As far as testifying

13   why, I will sustain your objection.

14             MR. BEQUETTE:  We are not offering any testimony as to

15   why they did.  He knows that they did.

16             THE WITNESS:  Cross County as well.

17   BY MR. BEQUETTE

18   Q    Earle?

19   A    Earle, Cross County.  And I read that in the newspaper,

20   and I have got the newspaper that said that they shut that down

21   to save money.

22             THE COURT:  Well, that's -- that would be hearsay, and

23   I can't consider that.

24             THE WITNESS:  Okay.

25   BY MR. BEQUETTE

1    Q    All right.  So, Mr. Estes, can you look at Defendants'

2    Exhibit No. 12 and tell us what this exhibit is?

3    A    Yes.  That is a list of savings that we would -- if we

4    went from a K-6 to a 7-12 configuration in Palestine as opposed

5    to a K-4, Palestine; 5, 6, 7, 8, Wheatley; 9 through 12

6    Palestine configuration, that is the savings we would get.

7    Q    Who prepared Exhibit 12?

8    A    I did.

9    Q    And what would be the total amount of savings from moving

10   the Wheatley Middle School campus to the Palestine campus and

11   consolidating as you just testified to?

12   A    It would be -- what this sheet says, and I left off two

13   things.  What this sheet says is 551,000 -- $551,437.57.  I

14   left off I would be able to cut another position in a health

15   teacher that I would not have to have, a health and PE person.

16   Q    Right.

17   A    I would not have to have.  I also have three nurses, one

18   for each campus.  If we was all right there at one place, I

19   could go down to one nurse.  That would save me roughly another

20   $75,000.  So you can add that up and be $625,000.

21   Q    Would the district still be in compliance by Arkansas

22   Department of Education regulations by reducing --

23            MR. WALKER:  Objection, Your Honor.

24            THE WITNESS:  Standards, yes.

25            THE COURT:  I'm sorry.

```
 1              MR. WALKER:  "Would the district be in compliance?"
 2    That's not for him to determine.  That's asking for an opinion.
 3              THE COURT:  That is if the Court views that as an
 4    opinion.  And he may give his opinion, and you may
 5    cross-examine him about it.
 6              MR. BEQUETTE:  Thank you, Your Honor.
 7    BY MR. BEQUETTE
 8    Q    So looking at the projected savings on faculty and staff,
 9    tell the Court how you compiled these numbers.
10    A    With the principal -- I have three principals.  I would be
11    able to cut one principal position.  I took all three
12    principals' contracts, averaged their -- what their salary is
13    for all three principals, divided it by 3 and added 24 percent
14    benefits and came up with $83,394 by cutting one principal
15    position.
16    Q    Is that how you, you know, mathematically develop those
17    numbers for each of those positions?
18    A    Mathematically, every position on there was done the same
19    way.
20    Q    And then you have also got a total for projected savings
21    on utilities by closing the Wheatley campus.  How did you
22    calculate those numbers?
23    A    Ms. Debbie Loewer gave me those, and those are a total of
24    what we spent last year at the Wheatley campus on utilities.
25    Q    I see.  And then you have got a projected savings in
```

1    transportation on an annual basis of $85,867.  How did that

2    number --

3    A    That number is a low-end number too.  What that is, if you

4    just take the shuttle buses -- just the shuttle buses.

5    Q    What are the shuttle buses?

6    A    The buses that we use to transport kids from Palestine to

7    Wheatley and from Wheatley back to Palestine.  If you just take

8    the shuttle buses, the mileage -- 13 miles times 4 -- 13 times

9    2 because you have to go back and then come back.  26 times 4

10   because there is four shuttle buses times 3.60 and then add the

11   stipends in and -- times $3.60 a mile, which is what the

12   Arkansas Department of Education, Mike Simmons, that's what the

13   Arkansas Department of Education says it costs to run a bus up

14   and down the road.  If you are going to a football game or

15   anywhere, the number you figure in there is $3.60 a mile.  If

16   you figure all that in there, it comes up to $85,867.

17   Q    And then you have a projected teacher transportation

18   savings between campuses of 10,285.  First, what is that number

19   for?

20   A    That is -- you know, it's tough sharing a teacher in two

21   different towns, but one thing we have to do to compensate the

22   teacher for their travel in between the two separate towns is

23   we provide them with an additional prep period.  So I took the

24   teachers that -- so it's roughly, if we're on a seven-period

25   day, it is 1/7 of their salary.  And that's -- I took the

1    teachers who we have traveling, and that's how I figured that

2    number.

3    Q    Would the district be able to totally eliminate those?

4    A    Totally eliminate that and we could use those teachers and

5    put them in a classroom and shrink the size of a classroom

6    where it would benefit the child better academically.

7    Q    So financially, you know, saving 5, $600,000 on an annual

8    basis, what kind of an impact does that have on the district's

9    budget, its ability to balance the budget, and stem these

10   declining end balances?

11   A    It would get us back in the black, get me out of trouble

12   with the state department, get me off fiscal distress early

13   indicator list, and we would be able to put that money back

14   into the children so we could do a better job at educating

15   them.

16   Q    You testified a moment ago about the letter that

17   Ms. Burnett from the state department sent to the district in

18   August of 2011.  Was a similar letter just recently received by

19   the district?

20            MR. WALKER:  Objection, Your Honor.

21            MR. BEQUETTE:  Pardon?

22            MR. WALKER:  That's leading.  There is not a similar

23   letter in the exhibit packet.

24            MR. BEQUETTE:  There isn't.

25   BY MR. BEQUETTE

1  Q    Has the district received a letter from the state

2  department this year?

3  A    Yes.

4  Q    And --

5  A    Regarding finances, yes.  Early indicators of fiscal

6  distress, yes.

7  Q    Who was it sent by?

8  A    Ms. Hazel Burnett.

9  Q    Have you had your meeting with Ms. Burnett?

10 A    I have not.  I have to have it on October 20th.

11 Q    Please turn to Defendants' Exhibit 13.

12 A    Okay.

13 Q    What is Exhibit 13?

14 A    Exhibit 13 is a accountability report for the middle

15 school.

16 Q    And what does it depict for the --

17 A    It depicts that it is a needs-improvement focus school.

18 The middle school is a needs-improvement focus school.

19 Q    What does that mean in laymen's terms?

20 A    Test scores are not where they need to be.

21 Q    How long has it been in that status?

22 A    Before this new accountability system, they were a

23 year-five, needs-improvement school.

24 Q    What kind of academic and educational changes can the

25 district make if it's allowed to close the Palestine-Wheatley

1   Middle School campus and move that campus over to the Palestine

2   campus?

3   A    We can align more as a K-6, 7-12 type alignment, which is

4   what every other 2A school in the state of Arkansas is.

5             MR. WALKER:  Objection.

6             THE COURT:  Well, I will overrule the objection.  He

7   can say that.  That's -- my focus is not on what other schools

8   do.  My focus is this consent decree and whether either the law

9   or circumstances have changed such that the district should be

10  relieved of adhering to the consent decree as written.

11            MR. BEQUETTE:  Thank you, Your Honor.

12            THE COURT:  Or whether it should be modified or

13  terminated.  That's the issue.

14       So, Mr. Walker, I understand your objection to what other

15  districts are doing.  He is not -- the witness is not a lawyer,

16  and I am just focusing on Palestine-Wheatley.  That's all I am

17  concerned about.

18            MR. WALKER:  Thank you, Your Honor.

19            THE COURT:  And I am concerned about the law and

20  changes in the district since the consent decree.

21            MR. BEQUETTE:  Thank you.

22  BY MR. BEQUETTE

23  Q    Mr. Estes, talk about the improvements, I guess first

24  focusing on what kind of impact would closing the middle school

25  campus in Wheatley have on your professional staff?

1    A    We would be able to use those teachers that are traveling.

2    We would be able to put them in the classroom where they could

3    be teaching kids, offering another course, providing more

4    offerings instead of paying them to travel back and forth

5    between one town and --

6            THE COURT:  Let me ask something about this travel

7    expense.  You are not saying that you pay a teacher mileage.

8    You are saying this is part of the teacher's compensation when

9    that teacher gets in the car during the school day and travels

10   to another campus; is that correct?

11           THE WITNESS:  Yes.

12           THE COURT:  And it takes how long for a teacher to

13   drive from one campus to another?

14           THE DEFENDANT:  Probably 20, 25 minutes.

15           THE COURT:  And then back is another?

16           THE WITNESS:  20-25 minutes.

17           THE COURT:  And that would be a class period?

18           THE DEFENDANT:  No, ma'am.  One way.  Each way they

19   go --

20           THE COURT:  They miss a period of class?

21           THE WITNESS:  They miss a period of class.  So instead

22   of coming to work and teaching seven classes a day, they teach

23   four and travel three or something like that.

24           THE COURT:  Okay.  It's not really travel expense.

25   It's just teacher salary due to, you know, work time spent on

1    the road.

2    BY MR. BEQUETTE

3    Q    But is that work time spent on the road a cost to the

4    district that you would not have to pay if it --

5    A    Yes.

6    Q    Because how would you change the schedule if you could

7    move the middle school campus to Palestine?

8    A    We would not be paying them to travel back and forth

9    between two separate towns.  We would be paying them to teach

10   classes in the classroom.

11          THE COURT:  I don't mind calling it travel expense,

12   but to me a travel expense is, when I go to Washington, D.C. on

13   court business, I am reimbursed for my plane ticket.  That's a

14   travel expense for me and that's -- it's not quite the same

15   thing, but --

16          MR. BEQUETTE:  Yes, ma'am.

17          THE COURT:  All right.

18   BY MR. BEQUETTE

19   Q    And then would these -- these projected savings in bus

20   time, how would that help students in achievement and education

21   in the district?

22   A    Be able to offer more programs.  Once we got financially

23   on our feet, we would be able to offer more programs.  But the

24   biggest thing, more than anything else, whenever a teacher has

25   a problem -- whenever a fourth or fifth grade teacher has a

1    problem with little Jon Estes or somebody and they're new --

2    they might have a file on him, but whenever you are sitting

3    there and talking to teachers you are able to, say, meet with

4    them before school.  We are a small school.  We know each

5    other.  And you can say, "I had this trouble" -- of course not

6    in front of kids or anything, but "I had this trouble with

7    something else.  You had him last year.  What did you do?"  And

8    that helps.  That's interventions.  And you can say, "I did

9    this, this, and this, and it worked great."  That is so

10   beneficial to the success of students, all students.

11   Q    How would closing a middle school campus in Wheatley

12   impact extracurricular programs?

13   A    We had a band concert last year, and that's one of the

14   things I have done since I moved there.  We started a band

15   program.  Band programs -- I believe in educating the whole

16   child.  And we started a band program.  Well, junior high, by

17   whatever reasons, is classified as seventh, eighth, and ninth

18   grade.  Well, seventh and eighth grade are practicing band at

19   10:00 o'clock in Wheatley.  Ninth is practicing band at 2:00

20   o'clock after the teacher gets in the car and drives over to

21   Palestine.  They're over there practicing band, and whenever

22   you get together for the Christmas concert or whatever, they

23   can't play together.  So by putting them all in one place, you

24   would be able to have a junior high band period, a junior high

25   athletic period, a whatever.

1      Right now, we adversely affect our kids because, if you

2  want to play football or basketball or whatever, you have to

3  get out of school, ride that bus all the way back to Palestine,

4  and you have to wait until after school.  Whereas, if you were

5  all at one place, you go out there at 2:00 o'clock, eighth

6  period.  Everybody can practice together.  Everybody can go

7  home, get more sleep, do their homework, learn more.

8  Q      And how would closing the Wheatley campus, how would that

9  affect the district's, say, Arkansas Leadership Academy

10 initiatives, professional learning center, committee

11 initiatives, those types of things?

12 A      Right now we hire people by campus, and it's really -- a

13 lot of that money is -- it's hard to justify hiring somebody

14 just to work with two math teachers at the high school.  My

15 math department at the high school consists of two teachers.  I

16 have got two and a half English teachers.  And then I would

17 have to hire somebody else to go to the middle school to work

18 with two teachers, whereas -- or one teacher.  I have one

19 seventh and eighth-grade math teacher, one seventh and

20 eighth-grade science teacher at the middle school; whereas, if

21 they were 7-12, I could hire one person to work 7 through 12,

22 get that curriculum aligned so that the kid was not learning

23 the same thing.

24      One thing that comes up and -- I had my -- and I caught

25 it, but I had my 11th grade, one of my 11th grade -- I think it

1    was 11th grade.  No, it was 9-10.  He ordered a classroom

2    section of *Lord of the Flies* last year.  Well, because he don't

3    know the person who is teaching 15 miles away in Wheatley, he

4    didn't know that she had ordered *Lord of the Flies*.  She was

5    teaching the same thing in seventh and eighth grade as he was

6    in ninth and tenth grade.  And so whenever you are talking

7    together, you can meet, and you have committees and leadership

8    teams and such as that, you alleviate some of that.

9             THE COURT:  All right.  Mr. Bequette, I want to remind

10   you of something.  It's important for the Court to consider

11   changed circumstances.  Some of what he is testifying to would

12   be true way back at the time your client entered into the

13   consent decree with the plaintiffs.

14            MR. BEQUETTE:  We understand that.

15            THE COURT:  And so I cannot consider, for example, the

16   *Lord of the Flies* problem.  The potential for that problem

17   could have arisen as a result of the consent decree, and it

18   could have been anticipated at the time of the decree.

19            MR. BEQUETTE:  Right.

20            THE COURT:  And so I cannot consider that, and so

21   that's -- it might be a great reason --

22            MR. BEQUETTE:  I wasn't anticipating that answer.

23            THE COURT:  -- but I need to consider what has changed

24   and if it has changed so much that it is just not fair to keep

25   your clients to their agreement.

1          MR. BEQUETTE:  All right.  Thank you, Your Honor.

2          THE COURT:  So that's --

3     BY MR. BEQUETTE

4     Q    Okay.  If you would turn, Mr. Estes, to Exhibit 14.

5     A    Okay.

6     Q    Now, Exhibits 14 and 15 are meant to respond to

7     Mr. Walker's argument in his opposition that the purpose of

8     building this new K-4 elementary building was really to house

9     the --

10         MR. WALKER:  Objection.  That's argument by counsel.

11         THE COURT:  It's best not to preface.

12         MR. BEQUETTE:  I wouldn't do it if we had a jury here.

13         MR. WALKER:  But it's also leading to the witness.

14         THE COURT:  Well, it is.  And so this is what I would

15    ask Mr. Bequette to do.  Don't preface your questions unless

16    you are having difficulty getting the witness to understand

17    your question, and if you are having trouble with a witness,

18    sometimes people can't even communicate very well with their

19    own clients.

20         MR. BEQUETTE:  I was just trying to move it along.  I

21    will ask him simply.

22    BY MR. BEQUETTE

23    Q    Mr. Estes, can you identify Exhibit 14, please.

24    A    School board meeting minutes from October 27, 2008.

25    Q    I see.  And what does this -- or does this -- do these

1   minutes speak to anything having to do with the building of the

2   K-4 elementary or the millage for that construction project?

3   A    That's where they motioned and seconded the millage

4   increase to build a new elementary school.

5   Q    Was there any mention of the closing of the middle school

6   made at this board meeting or --

7   A    Not at all.

8   Q    -- or any  mention of housing -- as you can see from these

9   minutes, of housing the middle school in Wheatley at the new

10  building in Palestine?

11  A    No, sir.  The elementary school in Palestine for the last

12  25 years has been K-4, so when we speak of elementary school,

13  we speak K-4 elementary school.  That's what we are referring

14  to.

15  Q    What is Exhibit 15, please?

16  A    That is a cover sheet of the architectural drawings for

17  the new K-4 elementary school in Palestine, Arkansas.

18  Q    Okay.  Now, is there any mention in the -- in this --

19  these drawings here, of this cover sheet -- is there any

20  mention of a middle school being constructed?

21  A    No, sir.

22  Q    Is there any mention here of, you know, an intent or plan

23  to house the middle school campus on Wheatley in this new K-4

24  elementary building?

25  A    No, sir.

1    Q    Now, if you would turn to Exhibit 16, please.

2    A    Okay.

3    Q    Can you identify this?

4    A    This is the funding matrix.

5    Q    And what is -- what is a funding matrix?

6    A    This is what state provides to us with our foundation

7    funding that says where the money that they provide to us, what

8    it's going for.

9    Q    I see.  And so how much does the district receive per

10   student from the state for transportation purposes?

11   A    Last year we received $303.80.

12   Q    If a district is able to transport a student for fewer

13   miles, does that change how much the district receives from the

14   state?

15   A    No, sir.

16   Q    And so what does that mean if the district is able to

17   reduce the number of miles that it's busing its students?

18   A    It means that -- it means that you have more money to

19   spend on academics.  It means if you are busing 1 mile or

20   1 million miles, you get $303.80.

21            THE COURT:  I am not supposed to bring things outside

22   of the record and this is outside of the record, but I wanted

23   to let you know.  Is that still the case -- is the state

24   suggesting now that -- someone within the Department of

25   Education or in the legislature suggesting that that formula

1   should be changed to take into account the actual number of

2   miles traveled per bus?

3              MR. BEQUETTE:  According to the newspaper, it's being

4   looked at, but there has been no change yet.  And as we stand

5   here today, it's 303.80.

6              THE COURT:  All right.  Okay.  I am sorry to bring

7   that in.  I wanted to inject that when you testified to it.

8   BY MR. BEQUETTE

9   Q    All right.  I want to ask you some questions about the

10  consent decree in this case that was entered into back in 1990.

11  There were ten requirements in that decree.  No. 1 was that the

12  district move the grades of five, six, seven, and eight to the

13  Wheatley campus.  Has the district complied with that?

14  A    Yes.

15  Q    Have monthly school board meetings been alternated between

16  the two campuses in Palestine and Wheatley?

17  A    Yes.

18  Q    Has the district established organized sports programs for

19  grades six and seven?

20  A    Yes.

21  Q    Has all stationery and printed material, including on

22  school vehicles, have the name Palestine-Wheatley?

23  A    Yes.  Stationery does.  School vehicles -- the buses have

24  Palestine-Wheatley, yes.

25  Q    The decree required that neither faculty at Palestine or

1    Wheatley be considered subordinate to the other.  Has the

2    district complied with that?

3    A    Yes.

4    Q    Has the district provided for students in both Palestine

5    and Wheatley two free telephones?

6    A    Yes, sir.  Phones in the offices.

7    Q    Has the district made efforts to create an educational

8    spirit in both communities?

9    A    Yes.

10   Q    What -- tell the Court what kinds of different things the

11   district has done to help create that educational spirit.

12   A    We have our parent-teacher conferences in both cities at

13   both locations and both campuses.  We have a booster club that

14   works with all the kids from -- and most of it is

15   extracurricular activities to include band, athletics.  But

16   they have also sent kids to Girls State and Boys State, and so

17   they work with academics as well.

18   Q    Are there clubs at both campuses?

19   A    Yes.  The Beta Club is at the middle school and National

20   Honor Society at the high school.

21   Q    I see.  What kinds of open houses are held at either

22   Palestine or Wheatley?

23   A    Last year, we had our young science teacher, he started a

24   science club at the middle school and had science club meetings

25   there at middle school.  We have after-school tutoring and such

1    as that at the middle school as well as the high school.

2    Everything the high school gets, the middle school gets too.

3    Q    I see.  And does either campus have a parent-teacher

4    association?

5    A    Not that I know of.

6    Q    All right.  And has the election of the boards been

7    pursuant to the standards of the Voting Rights Act to your

8    knowledge?

9    A    Yes.

10   Q    And have the terms in office for those board members --

11   are they three-year terms?

12   A    Yes.

13   Q    And what is the mascot of the district and the school

14   colors?

15   A    Red, white, and blue, Patriots.

16   Q    And has the school superintendent participated in any way

17   in any school board elections?

18   A    No.

19   Q    Has the district made a good-faith effort to try to comply

20   with the terms and requirements of the consent decree?

21   A    Yes.

22        MR. BEQUETTE:  Pass the witness.

23        THE COURT:  Mr. Walker?

24        MR. WALKER:  May I begin, Your Honor?

25        THE COURT:  You may.

CROSS-EXAMINATION

BY MR. WALKER

Q    I don't see a microphone.  Oh, right in front of me.

     Mr. Estes, were you a principal in any school district
before you came to Palestine-Wheatley?

A    No.

Q    I see.  Did you do an internship as a principal at any
district before you came to Palestine-Wheatley?

A    Yes.

Q    Where was that?

A    Drew Central School District.

Q    When you were principal of the -- made principal of the
high school, that was 2008-2009?

A    Yes.

Q    That was your first principalship?

A    Yes.

Q    You had not been an assistant principal before?

A    No.

Q    Did you have any responsibility with respect to the
settlement agreement in 2008-2009?

A    No.

Q    Did you have any responsibility with respect to the
settlement agreement in 2009-10?

A    Describe what you mean, responsibility to the settlement
agreement.

1    Q    Well, you indicated that you had none in 2008 and '9.

2    It's the same question for '9 and '10.

3    A    Well, I am asking you -- I'm thinking back.  What was you

4    talking about whenever you said do I have any responsibility to

5    the settlement?  Are you talking about the consent decree that

6    we just went over?

7    Q    Yes.

8    A    Well, yeah.  We had to keep up -- I was athletic director,

9    and we have to keep up with athletics.  Coaches come to me for

10   all that.  That started as soon as I got there.  I also have to

11   keep up with the buses.  I was the transportation director, so

12   I kept up with all of that.

13   Q    Did you attend all the board meetings?

14   A    Yes.  No, sir.  I may have missed one.

15   Q    Was that just in one year?

16   A    I think that's been since -- I don't think I have missed

17   more than one since I have been there.

18   Q    Did the previous superintendent assign you any

19   responsibility for implementation of the settlement agreement?

20   A    No, sir.  Everything was already implemented for the most

21   part that I know of.

22   Q    Were you aware of the court hearing in 2006 involving this

23   matter?

24   A    I was told about it, yes.

25   Q    Did you ever receive -- did you ever read the transcript

1    of proceedings in that case?

2    A    I am sure I did, yes.

3    Q    When did you do so?

4    A    Within the last year since I became a superintendent.

5    Q    Were you aware at the time -- but can you tell me what the

6    2006 proceedings were about?

7    A    Yes.

8    Q    What --

9    A    Well, it was about closing the middle school in Wheatley.

10   Q    Was it about the same thing as now, having basically all

11   of the facilities on one campus?

12   A    Yes.

13   Q    I see.  Now, the reasons urged at that time for closing

14   the school at Wheatley are the same -- according to your

15   reading of the transcript, are the same arguments or reasons

16   that you are submitting to the Court now; isn't that true?

17   A    Well, I would submit more --

18   Q    Just answer my question.  Isn't that true?

19         MR. BEQUETTE:  He was trying to answer the question,

20   Your Honor.

21   BY MR. WALKER

22   Q    Isn't it true that the reasons you are urging now are the

23   same reasons that you urged then?

24   A    No.  I would say not.  Mine are more academic and the

25   well-being of the children and all.

1          THE COURT:  Let him answer, Mr. Walker.  He said no.

2          MR. WALKER:  And I would like to ask him to specify.

3    BY MR. WALKER

4    Q    Can you tell me --

5          MR. BEQUETTE:  I don't like counsel cutting the

6    witness off.

7          THE COURT:  Well, I don't either, but you may -- so

8    they won't be talking over each other, I will let Mr. Walker

9    proceed and then you can clear it up on redirect.

10   BY MR. WALKER

11   Q    Now, there are different reasons now than in 2006, you

12   say?

13   A    I would say the biggest different reason -- yes.  I

14   apologize for interrupting you.  I would say the biggest

15   different reason would be putting the best interest of the

16   children and the academic aspect of it, providing that would be

17   just as -- yes, that would be something different.

18   Q    Are you saying that, when the board came before the Court

19   before in 2006, it did not present the idea that this was in

20   the well-being of the children?

21   A    I don't -- I don't remember reading where it was

22   academically better, in the best interest of the children.

23   Q    You are saying now that there is an academic justification

24   that did not exist then; is that what you are saying?

25   A    Yes, I would say so.  I would argue that, yes.

1  Q     Now, have your academic differences been reduced to

2  writing?

3  A     Have my -- no.  No.

4  Q     They have not?

5  A     Been reduced to writing?

6  Q     Yes, sir.  Have you put them in writing anywhere?

7  A     I don't know.

8  Q     Have you presented the academic differences in writing to

9  the Board of Education?

10  A     No.

11  Q     I see.  Have you presented them anywhere before you had

12  presented them to the Court today?

13  A     I have presented them to -- yeah.  Whenever we were going

14  over this, whenever we were talking about --

15  Q     You have answered yes.  When did you present them?

16  A     Within the last year.

17  Q     And to whom did you present them?

18  A     Jay Bequette.

19  Q     To Mr. Bequette, all right.  I see.  Did you present them

20  in writing to Mr. Bequette?

21  A     I am sure, yes.

22  Q     I see.  Do you have a copy of that writing?

23  A     I do not, not at this time.  I am up here.

24  Q     Did you prepare a list of the benefits, academic benefits

25  that are different now from what they were in 2006?

1    A    I prepared a list of academic -- yes, I did.  I prepared a

2    list of academic benefits I did not see that was brought

3    forward at that time.

4    Q    I see.  Now, what else has changed other than the

5    well-being of the children and academics that you shared with

6    Mr. Bequette?

7    A    I don't know what -- I don't know what the school, what

8    the district presented in the way of finances, but financially,

9    I have documentation showing where, you know, we have got to do

10   something different.  Definition of stupidity is to keep doing

11   the same thing and expecting different results, Mr. Walker.

12   Q    I will remember that.  Now, can you tell me -- are you

13   saying that what the district was doing in 2006 was stupid?

14   A    I am saying it is fiscally irresponsible to try to operate

15   three separate campuses in two different towns with roughly 650

16   K-12 students.

17   Q    You understood that in 2006 that same argument was made?

18   A    Yes, sir.

19   Q    I see.  Do you understand that that argument was made at

20   the time that this matter was presented in 1990?

21   A    No.

22   Q    I see.  Well, doesn't logic suggest that it's always

23   cheaper financially, if you have two cities like Little Rock

24   and North Little Rock, it would be cheaper, at least in terms

25   of administrative costs, having one city combined because you

1    wouldn't have to pay for two mayors and two administrative

2    staffs or things like that?  Is that --

3    A    One city combined, are you saying?

4    Q    Yes.  If you were to combine Little Rock and North Little

5    Rock, for example, then you wouldn't need two mayors?

6    A    Well, it's funny you say that because I graduated high

7    school in Springhill, Louisiana, and they have county-wide

8    school systems.  So they will have two or three separate

9    schools in this one school system like you are talking about.

10   But instead of having one superintendent who does everything

11   from driving a bus to cleaning restrooms to aligning curriculum

12   like I do, they have one high-paid superintendent and then they

13   will have three or four assistant superintendents and those

14   assistant superintendents will have helpers and helpers and

15   helpers and it never ends.

16              THE COURT:  I will just inject something.  That is all

17   irrelevant and --

18              MR. WALKER:  It is, and I withdraw --

19              THE COURT:  The Court does not view the role of a

20   school district as being providing employment for citizens.

21              MR. WALKER:  Yes.  Thank you.

22              THE COURT:  I don't view that.  I reject that.  And so

23   I will just strike all that, and just let's stick to the

24   consent decree and changes.

25              MR. WALKER:  I see.

1   BY MR. WALKER

2   Q     Do you know whether in 2006 the school district was on

3   financial alert?

4   A     I don't know.  I don't know.  I know that they was --

5   Q     Just a moment.  Do you know?  If you don't know, you

6   don't.

7   A     I don't know what financial alert -- I don't know if they

8   had a fiscal distress system at that point in time.

9   Q     Well, when did you first learn that there was such a thing

10  as financial alert imposed by the Department of Education?

11  When did you first learn about that?

12  A     Probably sometime whenever I was going through college to

13  get my master's and specialist degree.  That's probably when I

14  first learned about it.

15  Q     You have been at the board meetings since 2008?

16  A     Right.

17  Q     Have you ever heard the discussions regarding the district

18  being on financial alert?

19  A     No, sir.

20  Q     So it's your understanding that the first time you

21  received notice that the district was on financial alert was

22  when you received the letter from Ms. Burnett?

23  A     Yes.

24  Q     I see.

25  A     So that would be something new that has changed since

1    2006.

2    Q    Now, you received a letter from Ms. Burnett?

3    A    August 31st, 2011.

4    Q    I see.  So that's the first notice that you had that you

5    were on financial alert?

6    A    Yes.

7    Q    All right.  Was the -- was this request for modification

8    of the decree made at the urging of a particular board member?

9    A    No.

10   Q    At whose urging was this request --

11   A    This was --

12   Q    -- modification made?

13   A    This was my request to the board as a superintendent.  I

14   have got to do -- I am the leader of the school district.  I

15   have got to do what's best -- in the best interest of the

16   school.  I am not from Palestine or Wheatley, Mr. Walker.  I

17   don't have a dog in the fight, but if we are going to continue

18   to have a school district there, we had to do something

19   different.  And it came off my urging, my recommendation.

20   Q    I see.  You recommended that they go back to court and

21   seek to get out of court because the original plan did not make

22   sense?

23   A    That's right.

24   Q    Thank you.  Now, are -- you indicated that the

25   transportation timeline between the two buildings is about 20

1    minutes?

2    A    Roughly, yes.

3    Q    How many miles is it between the two buildings?

4    A    13.

5    Q    I see.  You have a building underway right now in terms of

6    construction; is that correct?

7    A    Yes.

8    Q    Did you get or do you know if the district got Court

9    approval for building that building?

10   A    I do not.  Not that I -- not that I remember.  I do not

11   remember nor do I know why they would have to get Court

12   approval to construct a building.

13   Q    I see.  Now, what is the intended population of that

14   building?

15   A    Around -- roughly 240-something-odd students is what it

16   was built for.  That's what the plans were for.  I have got all

17   that over there if you want to see it.

18   Q    Was the intended population to house some of the students

19   from the Wheatley district -- the formative Wheatley district?

20   A    Yes.  We house all the kids in kindergarten through fourth

21   grade from Wheatley.  We house all the kids from kindergarten

22   through fourth grade from Goodwin, Slankers Mill, from Gill,

23   from Palestine.  Yes, we have the kids from Wheatley.

24            THE COURT:  Go ahead.

25   BY MR. WALKER

1   Q    What was the anticipated enrollment for the new school you

2   did not get approval for?

3   A    200 and -- roughly -- I have got it over there with what

4   the state did.  I want to say it's 242 kids, Mr. Walker.

5   Q    And the amount of -- the cost of that construction was how

6   much?

7   A    3.9 million.

8   Q    3.9.  Now, did the state department provide funding to

9   assist you with that construction?

10  A    Yes.

11  Q    How much funding did the state department give you?

12  A    Roughly $1 million.

13  Q    I see.  Approximately 1/4 came from the state?

14  A    Yes.

15  Q    Now, when you submitted the millage proposal to the

16  members of the community and the district, you did have a

17  millage?

18  A    Yes.

19  Q    Did you indicate that you intended to close the Wheatley

20  school facility?

21  A    No, sir.  As a matter of fact --

22  Q    You have answered my question.

23  A    Let me explain though.

24  Q    You don't need an explanation.

25         THE COURT:  Mr. Bequette will have a chance to come

1    back and cover some of this.

2            THE WITNESS:  All right.

3    BY MR. WALKER

4    Q    Now, at the time that you -- were you the one to propose

5    this building?

6    A    Was I?

7    Q    Yes.

8    A    No, sir.  I was a principal at the high school.

9    Q    I see.  What was the rationale for that building when you

10   already had existing facilities adequate for all your

11   students -- in a declining community, declining enrollment

12   community?

13   A    At the time they entered into this, they did not have the

14   enrollment projections.

15   Q    So your enrollment projections are --

16   A    We was going up at that time.

17   Q    Well, you were going up?

18   A    Yes, sir.  The record will show that.

19   Q    All right.  Did you know that yourself?

20   A    Yes.

21   Q    All right.  Did you have something from the state

22   Department of Education that indicated that your projected

23   enrollment was going up?

24   A    Yes.

25   Q    Is there something in writing?

1   A     Yes.

2   Q     So the state department, in 2008, gave you a projected

3   enrollment -- or 2007, that was being increased; is that

4   correct?  That the students were going to be increased?

5   A     Not that I know of.  They gave us an enrollment projection

6   in whatever -- let's see.  They provided us an enrollment

7   projection January 11, 2012, that says our enrollment will

8   decrease by roughly 140 students in the next ten years.

9   Q     No.  Here is my question.  Have you seen anything to

10  indicate that the state department gave you a projection of

11  enrollment, that the enrollment of the district was increasing

12  between 2006 and 2011?

13  A     Have I seen the numbers that we have?

14  Q     No, no.  Have you seen such a document?

15  A     That the state department provided?

16  Q     Yes.

17  A     Not to my knowledge, no.

18  Q     All right.  You were aware that a Wheatley facility

19  burned; is that correct?

20  A     Yes.

21  Q     Which building was that?

22  A     That was the old Wheatley high school and the gymnasium

23  and the field house.

24  Q     All right.  Now, you are aware that you received more than

25  $2 million for insurance to replace those, did you not?

1  A     Yes.

2  Q     Were you aware that when you came to the -- when the

3  district came here before, the contention was made that you-all

4  were in negotiation with the insurance company as to how much

5  money would be actually paid?

6  A     Am I aware?  I think that was finalized before I got here.

7  Q     How much was actually paid by the insurance company for

8  the replacement of Wheatley facility on the Wheatley site?

9  A     Something better than $2 million.

10  Q     How much?

11  A     I don't know.

12  Q     Did you put that money in your fund balance?

13  A     I did not.  I was not superintendent at that time.

14  Q     Did some other superintendent put it in the fund balance?

15  A     Yes.

16  Q     Is that where it is now?

17  A     No, sir, it's not.  Most of that money has been spent on

18  the general operating funds to keep the school going.  We are

19  operating as a deficit, Mr. Walker.  I want the same thing as

20  you do.  I want what's best for all the black kids, the white

21  kids, the Hispanic kids, and every other kid at the school

22  district.  If we are going to have a school, we need to do

23  something different.

24          THE COURT:  Just let him ask questions.  The Court

25  understands your position.  I do.  Just answer his questions

1    please.

2    BY MR. WALKER

3    Q    So you did not -- and the board did not authorize use of

4    that money to restore or repair the facility which had burned?

5    A    No, sir.  They restored the high school.  They did not

6    rebuild the gym or the field house.

7    Q    Are the facilities -- what are the facilities at Wheatley

8    at this time?

9    A    What are they?

10   Q    Yes.

11   A    We have a -- we have one building that is -- serves

12   roughly the seventh and eighth grade.  We have one building

13   that serves the fifth and sixth grade.  We have a civic center

14   that is leased to the city of Wheatley.

15   Q    Are the facilities for students in grades seven and eight

16   in good repair?

17   A    Yes.

18   Q    Are the facilities for the students in grades five and six

19   in good repair?

20   A    No.

21   Q    Why aren't they?

22   A    It's just an old building, built in 1963.  We have put a

23   new roof on it.  We went in -- since I have been

24   superintendent, we put a new roof on it.  We have went in and

25   put new carpet, new floor down, painted all the walls and done

1    everything we could to it, but it's just an old -- 50-year-old

2    building, Mr. Walker.

3    Q    What facility burned?

4    A    My understanding is the -- what they used to call the

5    Wheatley high school.  It was the seventh and eighth grade

6    building and the gym.  It was connected together.

7    Q    I see.  Now, you have not restored all the facilities in

8    Wheatley.  Is that right?  Is that correct?

9    A    Right.

10   Q    You haven't done so in part because you have said that it

11   does not make financial sense to do so; is that correct?

12   A    Right.  If we was to build a new gym over there, we

13   wouldn't have money enough to --

14   Q    I see.  Now --

15   A    I couldn't get state approval to build a new gym over

16   there, I don't think.

17   Q    Just a moment.  Have you sought state approval?

18   A    To build a new gym?

19   Q    Just a moment.  Have you sought state approval in writing

20   for any construction on the Wheatley facility?

21   A    Yes.

22   Q    When did you do so?

23   A    As a matter of fact.

24   Q    Just listen to my question.  When did you do so?

25   A    I did not.  The district has.

```
1    Q    I am asking about you.

2    A    Okay.

3    Q    When did you do so?

4    A    I have not.

5    Q    Now, do you know when the district did so?  Do you know?

6    A    Yes.

7    Q    When was it?

8    A    About 2010.

9    Q    I see.

10   A    Maybe.

11   Q    All right.

12   A    2009 maybe.

13   Q    Well, so you really don't know?

14   A    I know generally 2009-2010.  Mr. Carroll Purtle was

15   superintendent at that time.

16   Q    Is your information based on what Mr. Purtle told you or

17   what you learned in the board meeting?

18   A    What I learned in the board meeting and from reviewing the

19   board minutes.  And also I had a board member ask me about it,

20   so I had to go back and look at the records and review and do

21   my research and that's how I know, yes.

22   Q    Okay.  Now, in terms of all these costs, all of these

23   advantages, you can use only one administrator for two

24   buildings instead of two administrators for two buildings.

25   That's your contention, isn't it?
```

1    A     No, sir.

2    Q     Well, you have three and you intend to have two left,

3    wouldn't you?

4    A     Yes, sir, we are cutting by a third, we have three, we are

5    going to cut down to two.

6    Q     I see.  Now, that was always the case, that was always

7    your choice in the past, wasn't it?  Whether you had two

8    administrators or three, that was always a choice of the

9    district, wasn't it?

10   A     No.  You need an administrator on each campus.  You have

11   to have more than one administrator per standards for every 500

12   kids.

13   Q     Well, are you familiar with the Department of Education

14   standards --

15   A     That's what I just quoted to you, Mr. Walker.

16         MR. WALKER:  May I approach, Your Honor?

17         THE COURT:  You may.

18   BY MR. WALKER

19   Q     Are you familiar with this standard?  It's 15.0 of the

20   standards.  Is that what you are relying upon?

21   A     Yes.  Exactly what I just told you, yes.

22   Q     Okay.  Now, this is from the Department of Education?

23   A     Right.

24   Q     I would like to just read it into the record.  Each school

25   shall employ at least a half-time principal.

1    MR. RICHARDSON:  If we could know which standard he is

2    referring to.

3    THE COURT:  15.0.  Yes.  Standard X, ADE-282-20.

4    MR. BEQUETTE:  May I see it, Mr. Walker?

5    MR. WALKER:  Yes.

6    BY MR. WALKER

7    Q    Each school shall employ at least a half-time principal.

8    A full-time principal shall be employed when a school's

9    enrollment reaches 300.  A school district superintendent may

10   be permitted to serve as half-time principal when the

11   enrollment is less than 300, providing the superintendent is

12   appropriately certified and is not already teaching classes.

13   Schools with an enrollment exceeding 500 shall employ at least

14   one full-time principal and a half-time assistant principal,

15   instructional supervisor, or curriculum specialist.

16        So is this your authority for saying that you have to have

17   three principals?

18   A    You need a principal --

19   Q    My question is, is this your authority for saying that you

20   have to have three principals?

21   A    My authority for saying we have to have three principals

22   is we have three separate locations and we need a principal at

23   each one.

24   Q    Is this your authority that says that the Department of

25   Education requires you to have three separate principals?

1   A    My rationale for having three principals is we have three

2   separate locations and you need a principal for each one.

3   Q    I am not asking about your rationale.  I am asking about

4   your authority.  You indicated that you are required to do

5   this.  Your authority is here, isn't it, that I have read, and

6   it says that you may have half-time principals, doesn't it?

7   A    Yes.

8   Q    And you have made a choice not to have half time

9   principals?

10  A    When you put the best interest of the children first, yes.

11  Q    Who has changed -- what has changed between 2006 in that

12  respect and now?

13  A    Well, you have got a lot more kids.

14  Q    Well, how many kids did you have in 2006?

15  A    524, if I remember correctly.

16  Q    Now, a lot more kids and I would like to come to that.

17  A    But, Mr. Walker, you are getting back on those standards,

18  because that's what we would use to deduce that number of

19  administrators from three to two.

20  Q    Just a moment.  Now, in terms of your student enrollment,

21  on -- you have given an affidavit, which is Exhibit B in this

22  case.  Do you have Exhibit B before you?

23  A    I do not.

24          THE COURT:  It was attached to the motion.

25          THE WITNESS:  But to answer your question, what has

1   changed, our enrollment at the time was 559.

2           THE COURT:  Just a minute.  Just let him ask the

3   question.

4           THE WITNESS:  Well, he asked it a while ago, I

5   couldn't answer.  I found my information.

6           THE COURT:  Well, Mr. Bequette will have an

7   opportunity later to clear up any confusion.

8           THE WITNESS:  I just like to answer completely.

9   BY MR. WALKER

10  Q    Exhibit B, you indicate what the student enrollment is in

11  paragraph 3.  Is this your affidavit?

12  A    Yes.

13  Q    Okay.  And then, at least you make reference to there

14  being 170 students at the Wheatley Middle School campus; is

15  that right?

16  A    No, sir.

17  Q    Well, in paragraph 3, you say the district uses four buses

18  to transport approximately 170 students to the Wheatley Middle

19  School?

20  A    Yes, I said that.

21  Q    Is that correct?

22  A    Yes.  We do use four buses, but that doesn't have anything

23  to do with how many kids go to school over there.

24  Q    How many students attend school over there?

25  A    I think it's about 220.  Some parents take their kids to

1   school.

2   Q     So you have 220 students --

3   A     Yes.

4   Q     -- at the middle school?  Middle School is roughly 1/3 of

5   the population?

6   A     Roughly, yes.

7   Q     Now, in paragraph 9, you say the students' enrollment is

8   696.

9   A     Yes.

10  Q     And you have indicated that approximately 2/3 of these

11  have a Wheatley address, a Goodwin address, or a Palestine

12  address; is that correct?

13  A     Yes.

14  Q     Isn't it true that a number of those students who enrolled

15  in your district come from Moro?

16  A     Some do, yes.

17  Q     And they come from Forrest City?

18  A     Yes.

19  Q     And they come from Marianna?

20  A     Yes.

21  Q     And they are basically white students?

22  A     And they come from Wynne and they come form --

23  Q     Just a moment.  All right.  They come from all over?

24  A     All over.

25  Q     They are basically white students?

1    A     The majority of them are, yes.

2    Q     So your enrollment has increased substantially because of

3    the district's willingness to accept students who do not want

4    to stay in their home districts, which are also majority black;

5    isn't that correct?

6    A     Some of them are.  Some of the districts are --

7    Q     The Moro children are in an all black -- in a majority

8    black district; is that correct?

9    A     Yes.

10   Q     The Wheatley children -- the Brinkley children are in a

11   majority black district, aren't they?

12   A     Yes.

13   Q     The Forrest City are too, aren't they?

14   A     Yes.

15   Q     And so are the Wynne children?

16   A     Right.  No, sir.  The Wynne district will be predominantly

17   white, as well as the Cross County district.

18   Q     So you have children coming from Cross County too?

19   A     Yes.

20   Q     If you lose those -- 1/3 of your population --

21   A     I don't know if that's 1/3.

22   Q     Just a moment.

23         THE COURT:  Just let him ask, and then you may respond

24   to his questions.  And once again, I will permit Mr. Bequette

25   to clear up anything that might be confusing.

1       Go ahead.

2   BY MR. WALKER

3   Q     Now, you say you have an increased population between 2006

4   and the present; is that correct?

5   A     Yes.

6   Q     And that in 2006, the enrollment was closer to

7   500-something?

8   A     Yes.

9   Q     Now, is it fair to say that that increased population

10  comes from the flight from those other districts?

11  A     Yes.

12  Q     Now, by my calculation, under your affidavit in No. 6,

13  assuming it to be true, the -- you have 57 percent of the

14  students with Palestine addresses and 10 percent of the

15  students with either Goodwin or Hughes -- or Wheatley

16  addresses, for a total of 67 percent of the students accounted

17  for; is that correct?

18  A     Where are you at?  Let me look and see.

19  Q     Your exhibit, which is B --

20  A     I have got the affidavit.  What paragraph?

21  Q     No. 9.

22  A     Okay.  No, sir.  That's not 57 percent.  That's 57

23  students have a Wheatley address.  That's 7 percent.  Only

24  7 percent have a Wheatley address.

25  Q     All right.

1    A    And out of those 57, only 21 of them are African-American.

2    Q    So 7 percent have a Wheatley address?

3    A    Okay.

4    Q    4 percent have a Goodwin address; is that right?

5    A    Yes.

6    Q    And that's 11.  And then 57 percent have a Palestine

7    address; is that correct?

8    A    I am not saying 57 percent.  I do think it's in there.  57

9    of these students are --

10   Q    Let's say 60 percent.  You say in line 3, 400 students or

11   60 percent have a Palestine address.

12   A    Or 60 percent.  Yeah, 60 percent.

13   Q    All right.  And Goodwin brings it up to 64 percent, and

14   the students who have a Wheatley address are 7 percent.

15   A    Okay.

16   Q    All right.  So 60 plus 7 plus 4 in my calculation is

17   71 percent.

18   A    Yes.

19   Q    All right.  So 29 percent of your students come from those

20   other districts; is that right?

21   A    Yes.

22   Q    All right.  Now, you are trying to provide -- you provide

23   transportation to those students who come from Wynne and the

24   other places once they get there, from Palestine over to

25   Wheatley; is that right?

1   A    Right.  As well as the ones who come from Brinkley and

2   Moro over to Palestine.

3   Q    So you are providing a lot of transportation to students

4   who don't even live in your district?

5   A    Yes.  They go to school there.

6   Q    Was that the way it was done in 2006?

7   A    I am not sure.

8   Q    I see.  And you are building a new school to accommodate

9   those students who come from Palestine, Wheatley, Moro, Wynne,

10  Forrest City, aren't you?

11  A    We are building that new campus to -- for all the students

12  who come from anywhere who go to school in Palestine-Wheatley

13  School District.

14  Q    And in that county, in that area, this is the only -- in

15  that county, this is the only majority white school district in

16  it, isn't it?

17  A    Yes.

18  Q    So you are holding yourself out as the place where white

19  people can come if they don't want to stay in a majority black

20  district, aren't you?

21  A    No, sir.

22  Q    Are you encouraging them to come there?

23  A    No, sir.

24  Q    What is building a new facility to accommodate them other

25  than encouraging it?

1    A    That is providing the children with a safe learning

2    environment, a place where they can learn as well as they can

3    anywhere.

4    Q    Let me ask you.  Is there anything to indicate that in

5    2006 the learning environment was not safe?

6    A    It was not -- a 50-year-old building is not as good as a

7    brand new building.

8    Q    You don't have anything to establish or to determine that,

9    do you?  That's an opinion, isn't it?

10   A    That's my opinion.

11   Q    And you are aware that there are facilities that are

12   hundreds years of age that are just as good as new facilities,

13   like this courthouse building?

14   A    That's your opinion.

15   Q    All right.  Well now, did you not read the consent decree

16   as at least implicitly requiring you not to promote

17   resegregation?

18   A    I did not see the word "resegregation" anywhere in the

19   consent decree.

20   Q    Since you are talking about a desegregation order, did you

21   not at least perceive the consent decree to be one where you

22   could not take actions that would be contrary to the purpose of

23   causing this to be one consolidated school district?

24        MR. BEQUETTE:  I object, Your Honor.  This is totally

25   irrelevant to the issue.

1           THE COURT:  I will overrule and permit the question,

2    but this is really argument you can save for me.  But since he

3    is the superintendent, I will let you ask.

4           THE WITNESS:  Mr. Walker, please ask your question

5    again.

6           MR. WALKER:  Well, Your Honor, I won't make -- and I

7    am mindful that you have to go in about five minutes.

8           THE COURT:  Yes.  If you want to break now, that's

9    fine.

10          MR. WALKER:  We may as well, Your Honor.

11          THE COURT:  I have a meeting that starts in five

12   minutes.

13          MR. WALKER:  That's fine with us, Your Honor.

14          THE COURT:  And let's just be back here, as I said, at

15   12:45, and we will go -- if you need a break, just tell me.  If

16   I need a break, I will tell you.  But we will break again

17   around 2:00 because I have another hearing.  So Court is in

18   recess until 12:45.

19       (Recess at 11:41 a.m., until 12:47 p.m.)

20          THE COURT:  All right.  Mr. Estes, you may resume the

21   stand.  You are still under oath.

22       And, Mr. Walker, you may resume your cross-examination.

23          MR. WALKER:  Thank you, Your Honor.

24   BY MR. WALKER

25   Q   Mr. Estes, you have indicated that there has been a huge

1    shift in demographics in the district?

2    A    Yes.

3    Q    Do you know what the demographics were in 2006?

4    A    No.

5    Q    All right.  The increased population, student population

6    is not due to the demographics, i.e. the basic population of

7    the Wheatley school -- Palestine-Wheatley School District is

8    it?

9    A    Say it again, please, sir.

10   Q    There has not been a lot of population shift in the

11   Palestine-Wheatley School District has there?

12   A    Yes, there has.

13   Q    How much?

14   A    Large as evidenced by the shift in the --

15   Q    My question is how much?

16   A    I don't know.

17   Q    I see.  Now, the shift in demographics to which you refer

18   relates to the influx of the students from the surrounding

19   districts, doesn't it?

20   A    No, sir.

21   Q    All right.  Is there anything in the plan that indicates

22   that when the demographics change you can change the plan?

23   A    What plan?

24   Q    Okay.  The agreement.

25   A    The consent agreement?

1   Q    Yes, sir.

2   A    No, sir.

3   Q    I see.

4   A    There -- yes, sir, there is, Mr. Walker.

5   Q    Would you draw my attention to the portion of the plan

6   where it allows that?

7   A    There is a section --

8   Q    Do you want a copy of the plan?

9   A    Let me see what you got.  It may be in the pre-agreement.

10  Q    In the what?

11  A    It may be in the pre-agreement.  I have a copy of that.

12  Q    Let me give you what was agreed to.  Can you identify this

13  document?

14  A    Yes.

15  Q    All right.  Can you draw my attention to anything there

16  that allows for that?

17  A    No, sir, I cannot.

18  Q    All right.  Is that something -- is that a criterion that

19  you made up a huge shift in demographics as allowing the plan

20  change?

21  A    Is that a criterion that I made up?

22  Q    Yes, sir.

23  A    No, sir.

24  Q    Did the board adopt that as a criterion for anything?

25  Shift in demographics in the district?

1    A     No, sir.

2    Q     All right.  Now, you don't have any written studies

3    indicating that there is a huge shift in demographics, nothing

4    in writing, do you?

5    A     Yes, sir.

6    Q     What is that, the thing that's prepared by your

7    demographer?

8    A     Yes, sir.

9    Q     He told you that he was not certified or qualified as an

10   expert to deal with the Voting Rights Act, didn't he?

11   A     No, sir, he did not say that.

12   Q     Was it your impression that he was qualified to address

13   voting rights issues?

14   A     Yes.  He even indicated in the freedom of information, one

15   of the e-mails, he was telling us about the importance of

16   keeping our two predominantly black districts, to keep them as

17   they are -- not as they are, but in order to comply with the

18   Voting Rights Act, we needed to make sure that we had the two

19   board zones.

20   Q     You have an exhibit which indicates the demography, at

21   least the size in terms of percentages of the seven districts

22   within the school district, right?

23   A     Yes.

24   Q     I see.  Do you have anything which reflects the population

25   percentages after your changes in 2011?  Is there anything that

1    reflects the new percentages?

2    A    Let me look and see.  We do have that.  I don't know if

3    it's in here.

4    Q    Just look and see.

5    A    Okay.  I do have that, sir.  It is not in here.

6    Q    All right.  Thank you.  So you are not able to show what

7    the -- whether or not there are two or three majority

8    African-American zones at this time?

9    A    There are two.

10   Q    Do you know what the percentages are?

11   A    I am not sure off the top of my head.

12   Q    And you didn't present as an exhibit anything with that in

13   it, did you?

14   A    No, sir.

15   Q    And you are not a demographer yourself, are you?

16   A    No, sir.

17   Q    Are you the one who redrew the lines?

18   A    No, sir.

19   Q    Did your demographer draw the lines?

20   A    James Walden drew the lines.

21   Q    Did the board discuss the redrawing of the lines before

22   you came to court?

23   A    Yes.

24   Q    When did they do so?

25   A    They had two options.

1    Q    No, no.  When did they have the discussion?

2    A    Earlier in the year.  I don't remember the exact date.

3    Q    Was that at a school board meeting?

4    A    Yes.

5    Q    Did it take more than a few minutes?

6    A    No.

7    Q    When the lines were redrawn, did you take them to the

8    county election commission?

9    A    Yes.

10   Q    Is there a board minute or a document that reflects that?

11   A    No.

12   Q    Have you read the Voting Rights Act?

13   A    No, sir.

14   Q    Have you discussed the voting rights changes with the

15   United States Department of Justice?

16   A    No, sir.

17   Q    Is there any reason you didn't?

18   A    There is no reason why I should that I know of.

19   Q    Have you discussed anything with the Department of

20   Justice, the Department of Community Relations?

21   A    No, sir.

22   Q    Are you familiar with what that organization is?

23   A    No, sir.

24   Q    Do you know what's meant by site selection criteria?

25   A    No, sir.

1   Q    Before you embarked upon replacing the new school -- or

2   replacing the old school with the new one for the elementary

3   children, did you take into account location of that facility

4   at any other site than the present site?

5   A    Yes, sir.  Whenever -- yes, sir.

6   Q    Did you have criteria reduced to writing regarding site

7   selection?

8   A    Yes.

9   Q    Where are they?

10  A    Where are the writings or where was the locations?

11  Q    Where are the criteria?

12  A    They have got some in my office.

13  Q    I see.  Now, that building that you-all have under

14  construction costs about $4 million; is that correct?

15  A    Yes.

16  Q    Would you agree that it's on a rather -- it's on a rather

17  cramped site?

18  A    Cramped?  Yes, sir.

19  Q    And you put it right next to the high school building?

20  A    Yes, sir.

21  Q    There is no real separation between the high school and

22  the elementary school underway?

23  A    There is separation.  There is not much to speak of.

24  Q    Maybe 50 feet.

25  A    Maybe.

1    Q    Is that right?  Do you have some opinion as to the

2    educational benefit of having elementary children in such close

3    proximity to 9th, 10th, 11th, and 12th-grade students?

4    A    Do I have --

5    Q    An opinion as to the educational benefit of having early

6    age children in proximity to older children in 9th, 10th, 11th,

7    and 12th grade?

8    A    Yes.  I think it allows teachers to be better able to

9    collaborate and work together for the best interest of the

10   academic well being of the child.

11   Q    Are you saying that the 4th, 3rd, 2nd, and 1st-grade

12   teachers are going to work together with the 9th, 10th, 11th,

13   and 12th-grade teachers?

14   A    Yes, sir.  Like our music -- yes, sir.

15   Q    Okay.  You indicated that you considered some other sites.

16   Did you consider the Wheatley site?

17   A    Yes, sir.

18   Q    Are there any objective reasons why you rejected the

19   Wheatley site?

20   A    The board voted on -- yes.

21   Q    Do you have any objective reasons why you rejected the

22   Wheatley site?

23   A    Yes.

24   Q    What are the objective reasons?

25   A    Wheatley voters turned it down 4 to 1.

1    Q    So because of popularity?  Is that the only reason that

2    the vote -- the millage was not supported by the Wheatley

3    patrons?

4    A    No, sir, that's not the only reason.

5    Q    Now, what other other reasons do you have?

6    A    Transportation.

7    Q    Now, in terms of the millage, you are saying that the

8    Wheatley patrons were against the millage 4 to 1; is that

9    correct?

10   A    Yes, sir.

11   Q    And that meant the Palestine patrons were in favor of it 3

12   or 4 to 1?

13   A    Yes, sir.

14   Q    So you put the site where the people voted?

15   A    The majority of the people, yes.

16   Q    So it wasn't based on educational reasons that are reduced

17   to writing?

18   A    Probably not.

19   Q    Thank you.  Now, the addresses in -- that you talk about

20   with respect to where people live, they are somewhat

21   irrelevant, aren't they, because you have a city of Palestine,

22   which is a rather small geographic area; isn't that correct?

23   A    Yes.

24   Q    And most of the people who have Palestine addresses live

25   outside of Palestine, don't they?  Outside the city limits of

1   Palestine, don't they?

2   A    I would not say most of them, no, sir.

3   Q    Many of them do, don't they?

4   A    Yes, sir.

5   Q    So when you talk about the Palestine address, you are not

6   talking about the city of Palestine?

7   A    The Palestine zip code, yes.

8   Q    So many of them live as far as 13 or 14 miles away from

9   school, don't they?

10  A    It might be, but I would not think it would go that far.

11  Q    That's a guess, isn't it?

12  A    A big stretch.

13  Q    You indicated you were a bus driver and you know the

14  demography of the district?

15  A    I have driven buses, yes.

16  Q    Have you driven over every route of the district?

17  A    Yes.

18  Q    So you know where people live according to race?

19  A    Yes.

20  Q    If you know that, can you tell me what changes have taken

21  place in Wheatley in terms of where people live?  Aren't the

22  people in Wheatley who were there six years ago the same people

23  who are there now?

24  A    I don't think there are as many of them.

25  Q    But in terms of the people, they still live in the same

1    places, don't they?

2    A    There is a lot of houses for sale in Wheatley too.

3    Q    There are a lot of houses for sale a lot of places, right?

4    A    Right.

5    Q    Did you make a tally to determine how many people had

6    moved out of Wheatley?

7    A    No, sir.

8    Q    Now, some of the people who live in Wheatley with Wheatley

9    addresses don't live in the city of Wheatley, do they?

10   A    That's right.

11   Q    So when you use these addresses, they don't really mean

12   much because this is a rural district and almost everybody in

13   the district rides the bus; isn't that correct?

14   A    I don't know if almost everybody does.  A lot of --

15   Q    What percentage of the students actually ride the bus?

16   A    I don't have a percentage of the students.

17   Q    Is it more than 70 percent?

18   A    It would be a guess either way.

19   Q    You should know what your bus transportation statistics

20   are; is that right?

21   A    Possibly so.

22   Q    All right.  You don't present that to the Court today, do

23   you?

24   A    No, sir.

25   Q    All right.  Now, have you made a projection of population

1    decline in the area?  Have you made that projection?

2    A    I can --

3    Q    That's yes or no.

4    A    Let's go back to the last question.  I can tell you that

5    230, roughly 230 kids or 1/3 of the students in the

6    Palestine-Wheatley School District ride a shuttle bus either

7    from Palestine to Wheatley or from Wheatley to Palestine.  As

8    far as the route buses go, I cannot tell you at this time.

9    Q    So you don't know how many children actually ride buses?

10   A    I know 230 of them ride a shuttle bus from one campus to

11   another campus.

12   Q    How many buses do you have?

13   A    We have eight buses.  We run five different routes.

14   Q    And how many shuttle buses are used in the shuttle?

15   A    Six.

16   Q    How many times a day do they go?

17   A    Twice.

18   Q    Twice a day?

19   A    Yes.

20   Q    So those same buses pick up kids?

21   A    Yes.

22   Q    And then they keep on going over to Wheatley, don't they?

23   A    Yes.  Some of them do.

24   Q    Or some may stop off at Wheatley first?

25   A    Two of them, yes.

1    Q    So all of these kids that you say go over to the high

2    school or at least to the Palestine campus and then are

3    transported to Wheatley, that's not correct, is it?  Some of

4    them start off at Wheatley, don't they?

5    A    On the route -- do you want me to show you where the

6    routes are?

7    Q    Just answer my question.  Some start off the day initially

8    at Wheatley, don't they?

9    A    Yes.

10   Q    You don't know what their addresses are, do you?

11   A    No, sir.

12   Q    Can you tell me how many of the white-flight students

13   start off their day at Wheatley?

14   A    I cannot give you specific numbers, no.

15   Q    Can you tell me how many of the white-flight students

16   start off their day in Palestine?

17          MR. BEQUETTE:  Object to the use of the term "white

18   flight."  That's argumentative.

19          MR. RICHARDSON:  Join that.

20          THE COURT:  Okay.  And Mr. Richardson joins in that

21   objection, and the Court sustains it.

22          MR. WALKER:  If I may for a moment, I asked this

23   witness whether or not he would call these white-flight

24   earlier, and he said yes.

25          THE COURT:  I don't remember that term exactly.  He

1    agreed that part of the population of the Palestine schools are

2    white children who do not live in the Palestine-Wheatley School

3    District, that they live elsewhere in other districts.  That's

4    what he testified to.  I don't -- I don't ever remember that he

5    said that these are "white flight" and that -- it is a question

6    of fact, first of all, whether that's the reason they came

7    there.  I am not saying that that's a relevant question for

8    this litigation, but it would be a question of fact.  And,

9    furthermore, whether it's important for me to know in

10   determining whether to modify or terminate the consent decree

11   would be a question of law.

12             MR. WALKER:  Yes, ma'am.

13             THE COURT:  I don't know that that's important for me

14   to decide, but --

15             MR. RICHARDSON:  It would be the state's position that

16   it's not.

17             THE COURT:  In any event.

18             MR. WALKER:  He is the plaintiff, so he has to take my

19   position.

20             THE COURT:  I know.  Things are all twisted in these

21   school cases, Mr. Walker, as you know.

22             MR. WALKER:  I understand, Your Honor.

23   BY MR. WALKER

24   Q    Now, have you made a -- compiled a list of the reasons

25   these white children from the other school districts come to

1   Palestine-Wheatley?  Have you made a compilation of the

2   reasons?

3   A    I have put them on my resume, yes, sir.

4   Q    On your resume?

5   A    Yes, sir.

6   Q    Do you have your resume with you?

7   A    No, sir.

8   Q    What are the reasons?

9   A    Good question.  I am glad you asked that.  When I took

10  over the high school at Palestine, it was one of the five

11  persistently lowest achieving high schools in the state of

12  Arkansas.  One of the five worst high schools in the state of

13  Arkansas.  After three years, our test scores have gone up so

14  much that right now our high school is probably arguably the

15  best high school in eastern Arkansas.  My -- hold on.  You

16  asked me.  Let me answer.

17  Q    I am asking your compilation of the reasons.

18  A    That's one reason, because we have the highest test scores

19  in east Arkansas.  Another reason is because, before I went

20  there five years ago, they was calling the law out there every

21  day.  Cops were coming every day to break up fights.  My last

22  year as high school principal, year before last, there was two

23  fights at the high school the entire year.  Our kids get along.

24  They don't fight.  They learn.  It's a good school.  We call it

25  the Diamond of the Delta.

1    Q    Now, what's the racial percentage enrollment?

2    A    Of the school district?

3    Q    Palestine-Wheatley with students who come from other

4    districts.

5    A    We're roughly about 78 percent white.

6    Q    And is it fair to say that all of the other school

7    districts in St. Francis County are a majority

8    African-American?

9    A    Yes.

10   Q    All right.  Now, you have not made a written compilation

11   of reasons given by those people for coming to your district,

12   have you?

13   A    No.

14   Q    Now, you did say something about having three nurses.  You

15   have three full-time nurses?

16   A    Yes.

17   Q    Why do you need three full-time nurses?

18   A    I have three separate campuses.  And, Mr. Walker, they was

19   there before I got there.  I really don't see the need for

20   them.

21   Q    I notice in your projections that you don't plan to change

22   them?

23   A    You mean on the cost savings?

24   Q    Yes.

25   A    Yeah, I would.  That's something I didn't think about

1    until after I had made that.  That's why I said it this

2    morning.  We could change out that -- change that out and get

3    rid of one of the PE teachers as well.

4    Q    But you have three full-time nurses for 600 students?

5    A    Yes, sir.  696.

6    Q    You have got one nurse on campus with about 440 students.

7    You have two nurses on one --

8    A    Yes.  One at the elementary school and one at the high

9    school and one at the middle school.

10   Q    And those are full-time people?

11   A    Yes.

12   Q    What is their race?

13   A    White.

14   Q    Okay.  Now, you indicate that your school is a high

15   achieving school, and I hope it is.  But you are in your fifth

16   year of school improvement at the high school, aren't you?

17   A    No, sir.  We moved off the school improvement list to an

18   achieving school.  We are one of the only schools in the state

19   of Arkansas to ever be removed from a Year 4 school improvement

20   up to achieving.

21   Q    When was that?

22   A    Year before last.  My first two years as principal, we

23   made AYP, adequate yearly progress.

24   Q    Now, do you have a black elementary principal?  Former?

25   Ms. Smith?

1   A   She is a middle school principal.

2   Q   She is middle school?

3   A   Yes.

4   Q   Was the middle school on school improvement?

5   A   Was it or is it?  Yes.

6   Q   Was it on --

7   A   Yes.

8   Q   When did she become middle school principal?

9   A   This year.

10  Q   All right.  Now, she --

11  A   That's the -- last year, last school year.

12  Q   Before the last school year, was the elementary school on

13  school improvement?

14  A   No.

15  Q   So she had been the principal there all the time, and it

16  was the only school that you had two years ago that was not on

17  school improvement; isn't that correct?

18  A   No.  Two years ago the high school came off school

19  improvement.

20  Q   It had just come off.

21  A   Right.

22  Q   But when Ms. Smith was there, her school was never under

23  school improvement, was it?

24  A   No, sir.

25  Q   You rearranged the principals this year, right?

1    A    No.  Last year.

2    Q    That's fine.  You took Ms. Smith from the school where you

3    were not on school improvement and you put her in the middle

4    school, which is also the former black school in Wheatley,

5    which is in school improvement; is that correct?  The middle

6    school is in school improvement, right?

7    A    The middle school is in school improvement.  I would not

8    say it's a former black school.  Wheatley Central is the former

9    black school.

10   Q    Just a moment.  Did you move her to the Wheatley site?

11   A    I did not.  The previous administration did.

12   Q    I see.  Now, did you participate in that decision?

13   A    No.

14   Q    So it's fair to say that in -- two years ago, you didn't

15   participate in any of the decisions regarding policy in the

16   school district?

17   A    No.  I did not -- I -- yes, sir.  We changed policy in the

18   handbook all the time.

19   Q    All right.  But you recommended policy at that time?

20   A    I recommended policy as far as my school went, as far as

21   handbook and policy and such as that.

22   Q    I see.  Now, who did you put into the elementary principal

23   where the school was performing adequately and satisfactorily

24   when Ms. Smith was replaced or removed?

25   A    Ms. Patty Hernandez.

1   Q    Is she is a new principal?

2   A    She was at the middle school.

3   Q    She was at the middle school, which was not satisfactorily

4   performing, right?

5   A    Yes, sir.  She had been there a year.

6   Q    All right.  You took her -- she is white, isn't she?

7   A    I am not sure.

8   Q    But you know she is not black?

9   A    I am not sure as to what her race is, sir.

10  Q    Nonetheless, you took her from the school --

11  A    She is a little darker than me.  She is lighter than you.

12  Q    You took her from the middle school and put her in the

13  elementary school and then had Ms. Smith transferred from the

14  elementary school to where she was; is that correct?

15  A    Yes.

16  Q    What is the reason for that?

17  A    Because Ms. Smith is probably the best principal at the

18  entire school district.  I needed somebody and the school

19  district needed somebody and Mr. Carroll Purtle needed somebody

20  who could go over there and run the school the way you needed

21  to because you can't look after that school as you can the ones

22  at Palestine because it's 13 miles away.

23  Q    Was that the reason you can't look after it?

24  A    That's -- it's a whole lot easier to get up from my office

25  and walk to the high school or the elementary school than it is

1    for me to get up and go take care of something at the middle

2    school.

3    Q    That was always the case of any superintendent, wasn't it?

4    A    Yes.

5    Q    So that's not a changed circumstance, is it?

6    A    No.

7    Q    All right.

8    A    But that is the reason we moved Ms. Smith.

9    Q    Now, let me ask you.  Since I have gone over your reasons,

10   can you tell me now, again, succinctly, without elaboration,

11   what changed circumstance between 2006 and 2011 exists on an

12   objective basis?

13   A    Yes.

14   Q    All right.  What is the first one that changed -- that has

15   changed since 2006?

16   A    The board's zones have been redrawn since 2006 to show a

17   change in demographics from whenever they was originally drawn

18   under court order in 1990.

19   Q    The boards have been redrawn, right?

20   A    Yes.

21   Q    What else?

22   A    Fiscally, we are setting off fiscal -- early indicators

23   for fiscal distress two years in a row.  Fiscal distress was

24   not around in 2006, that I know of to my knowledge.

25   Q    What else?

1    A    Third thing is academically.  The middle school was not on

2    year-five school improvement in 2006.  So those are three

3    things that have changed since 2006.

4    Q    Does the plan address academic improvement?

5    A    Yes.

6    Q    Where in the plan does it address academic improvement?

7    A    Are you talking about the consent decree again?

8    Q    Consent decree, yes.

9    A    No, sir.

10   Q    All right.  Does the plan address fiscal distress?  If so,

11   draw my attention to it.

12   A    No, sir.

13   Q    Does it address redrawing of the attendance zones

14   without -- just a moment, you have no evidence of what the new

15   zones' numbers are, do you, that you can present?

16   A    I do.  If I could present it, I could pull it up probably

17   before the end of the -- it wouldn't take no time.

18   Q    Well, is this something you did yourself?

19   A    No, sir.

20   Q    That's what your expert did?

21   A    That's what James Walden did.

22   Q    The man you hired as an expert?

23   A    The man we hired, yes.

24   Q    And you haven't shared those with us, have you?

25   A    No, sir.

1    Q    So I am trying to find now --

2            THE COURT:  Let me -- just for the record, I am going

3    to ask about that because we have got some maps in here.

4            MR. WALKER:  Yes, ma'am.

5            THE COURT:  We have got a 1990 map.  We have got what

6    must be the 2000 map.

7            MR. WALKER:  Yes, ma'am.

8            THE COURT:  And we have heard testimony about the 2010

9    map, and do we have that in the record anywhere, Mr. Bequette?

10           MR. BEQUETTE:  Yes, ma'am.

11           THE COURT:  Okay.  What can you tell me?  I just

12   missed that when you had him on direct.  I mean, the map that's

13   drawn as a result of the 2010, is that Exhibit 7?

14           MR. BEQUETTE:  No.  We do not have the map of the

15   zones as they have been redrawn.  We do have the last -- or the

16   first page of Exhibit 5 shows the existing board zones and how

17   they have -- how they are, you know, out of --

18           THE COURT:  And why they need to be redrawn?

19           MR. BEQUETTE:  Correct.  And then the last page of

20   Exhibit 5 is a -- the current zones and how that out-of-balance

21   is depicted on the map.  We don't have the current map.

22           THE COURT:  Okay.  I should have been listening more

23   carefully on direct.  So thank you.

24   BY MR. WALKER

25   Q    Now, you had made a judgment yourself, hadn't you, when

1    you went to work there that the whole thing they were doing

2    didn't make sense; isn't that correct?  And you told the board

3    that at the board meeting right when you were hired?

4    A    No, no.  Not right when I was hired.  I did tell them that

5    we needed to do something better at one board meeting -- I

6    don't remember which one -- that what we was doing was not

7    working academically, financially, and that we needed to do

8    something different.

9    Q    Now --

10   A    And they agreed.

11   Q    Did any board member discuss with you the consent decree?

12   A    No.

13   Q    Did you discuss with any board member the consent decree?

14   A    I discussed it with all of them.  I said we can't --

15   Q    Listen to me.  Discussion -- a discussion is one thing.

16   Did you tell them what the consent decree was, and then go over

17   it with them?

18   A    I did not see a need for that.  They knew what the consent

19   decree was.

20   Q    Well, you have the same board members in 2011 that you had

21   in 2006?

22   A    No, sir.  Six of them are new.

23   Q    All right.  So --

24   A    That's something else that has changed.

25   Q    Let me ask.  You-all just had an election?

1   A     Yes, sir.

2   Q     Was it pursuant to the new zone lines?

3   A     Yes.

4   Q     And they were not preapproved by the Court?

5   A     Well --

6   Q     They were not preapproved by the --

7              MR. BEQUETTE:  I object.  That's irrelevant.

8              THE COURT:  I will sustain the objection.  I don't

9   know that the Court had to approve them.

10             MR. WALKER:  Your Honor, here is the problem.

11             THE COURT:  This is not a Section 5 state or district.

12  We don't have -- under the Voting Rights Act, it doesn't

13  require preclearance.

14             MR. WALKER:  Well, the Court wouldn't be -- I guess

15  the Court would be involved in preclearance.  That's fine, Your

16  Honor.

17             THE COURT:  Well, many years ago you, representing

18  other plaintiffs in another case, attacked the way the zones

19  were drawn under the Voting Rights Act, and you could have done

20  that in this case.

21             MR. WALKER:  I didn't know about it.

22             THE COURT:  But I don't believe that anything requires

23  Palestine-Wheatley to come to this Court for preclearance of

24  the zones.  If that had been in the consent decree or part of

25  some other court order, that would have been another matter,

1    but I don't believe that that was in it.

2          MR. WALKER:  Your Honor, I think Section 8 requires

3    that single member districts be established.

4          THE COURT:  Sure.

5          MR. WALKER:  And that those districts meet all the

6    standards of the Voting Rights Act.  And since we don't have

7    and you don't have the numbers, obviously that's a subject for

8    discovery.

9          THE COURT:  Well, we do have the numbers -- we have

10   numbers showing that they were out of balance and that they

11   needed to be within -- is it a 10 percent up or down?  I just

12   had a Voting Rights Act case, so I should know.

13         MR. RICHARDSON:  I believe that's right.

14         THE COURT:  10 percent up or down, and they redrew the

15   districts, according to testimony.  We don't have the map, and

16   we don't have the numbers.  And that is -- I will let you ask

17   in discovery for that map and those numbers.  I imagine they

18   can give them to you.

19         MR. BEQUETTE:  We will provide those voluntarily.  We

20   just don't believe they're relevant to this particular

21   proceeding.

22         THE COURT:  Exactly.  This is what -- I am going to

23   make clear what I am looking for in this case:  Whether

24   circumstances have changed since the adoption of the consent

25   decree.  And Mr. Walker keeps saying since 2006, but really

1    since the adoption of the consent decree.  I ruled in 2006 that

2    the district could not close the school at Wheatley because the

3    district did not carry its burden of proving that things have

4    changed so much that as of that time that they should be able

5    to close it.  That's notwithstanding how efficient it would be

6    or what have you.  That's just the way I ruled and because the

7    Federal Court's job is to keep parties to their agreements.

8    And this is what the school district agreed to in 1990.

9        So today I am looking to see whether there have been --

10   first, whether circumstances have changed so much that it is

11   not right to hold the Palestine-Wheatley School District to

12   this consent decree and, if that's true, whether the Court

13   should modify it or whether the Court should just terminate

14   that agreement.  And I am scared to modify a consent decree.

15   Judge Henry Woods tried to do that in the Little Rock school

16   case.  The Eighth Circuit does not like to see a judge jump in

17   and modify a decree.  And so from that time on, whenever I had

18   a consent decree that needed modification, I told the parties

19   to go try to modify it.  And frankly, Mr. Walker, you-all did

20   when I had that case.  You-all did modify it.  So that's one

21   issue, is whether circumstances have changed so much.

22       Another issue is a legal issue, and that is there has been

23   law passed by -- I mean, Supreme Court cases and legislation

24   that might have an impact on this case, and I am thinking of

25   the Supreme Court case that came after *Rufo v Inmates of* --

1      you-all mentioned it.  I am also talking about the Arkansas

2      school choice law that Judge Dawson ruled on recently and is

3      now before the Eighth Circuit.  And I am talking about the

4      aftermath of the Lake View litigation that put -- that made

5      this special category of school district in distress so that a

6      district in distress, under that statute, has to either shape

7      up or be merged with neighboring districts that are not in

8      distress.

9          So all of those things are legal changes.  So I am looking

10     at, first, the facts.  That's what we're dealing with today,

11     what has happened since the consent decree, and then I am going

12     to let the lawyers brief me on how the law has changed and how

13     that might have an impact on this Court's decision.

14         Mr. Richardson?

15         MR. RICHARDSON:  Only one thing I might add to that.

16     I think there is another standard that applies, and I can give

17     you a case on the changed circumstances argument.  I was going

18     to save this to the end, but since you brought it up, I thought

19     I would mention it.  And I think maybe you are referring to the

20     *Freeman v Pitts* earlier.

21         THE COURT:  I am.

22         MR. RICHARDSON:  Part of the standard there is whether

23     or not the school district has complied with its consent decree

24     in good faith for a reasonable period of time.  So I think

25     there is -- in these cases there is basically two questions.

1    Changed circumstances is one, and compliance with the consent

2    decree is another.  Showing compliance with the consent decree

3    is enough for a school district to achieve release from the

4    consent decree.

5         THE COURT:  Well, the trouble is in my opinion *Freeman*

6    *v Pitts* is not going to fit these facts.  Even though the

7    district might have complied in good faith for a long time,

8    what they're telling the Court they're going to do is exactly

9    what the consent decree required that they not do, and that is

10   close the school.  The *Freeman v Pitts* situation is one in

11   which the Court walks away from the consent decree because it's

12   apparent the parties will continue in good faith to abide by

13   it.  That's not here.  That's just the opposite of what we have

14   here.

15        MR. RICHARDSON:  If I give you a citation on the

16   standard that I just related -- it's in the Little Rock School

17   District case, and it's from last December, a decision that

18   didn't turn out very well for me, but 644 F.3d 738.  The Eighth

19   Circuit in that case told the Pulaski County Special School

20   District that a constitutional violator seeking relief from a

21   desegregation plan adopted as a consent decree by showing that

22   it complied in good faith with the desegregation standards and

23   that the vestiges of past discrimination have been

24   eliminated -- and that's quoting *Freeman*.

25        The other case, though, *Flores*, and that's a changed

1   circumstances case.  And the site on that is 129 S.Ct. 2579.

2          THE COURT:  I think we have that one, but go ahead.

3   You can --

4          MR. RICHARDSON:  The only other point I would make

5   about that is in that case the Supreme Court instructs that it

6   must be a flexible review under Rule 60 and it's not a

7   heightened review as was suggested in the prior cases.  With

8   that, I will --

9          THE COURT:  But keep in mind the good-faith

10  compliance, I don't think -- I don't think any -- that *Freeman*

11  *v Pitts* case was an example where it's -- in other words, if a

12  district is doing so well now that we can walk away because

13  they're not going to go back to any kind of discrimination, de

14  facto or de jure.  In other words, everything is working well

15  and they're doing everything they are supposed to do.  And in

16  this situation, the district is saying, Look, we can't do this

17  any more.  Things have changed.  It's difficult.  We're going

18  under.  That's their argument.  It's not -- they will maintain

19  that they have been in good faith, but they're not saying that

20  good faith alone is the reason we should let -- we should

21  release them.  They're saying changed circumstances.

22      I think this is a totally changed circumstance.  I am not

23  saying that good faith or bad faith is irrelevant, but I just

24  think that here, their argument is:  We want to do exactly what

25  the consent decree requires that we not do, that is, close a

1      school.

2            MR. RICHARDSON:  Well, yes.  I agree with that.  I

3      think there also is a position that they have complied with it

4      for 12 years.

5            THE COURT:  I don't know that anyone is saying they

6      didn't.  Mr. Walker might take that position, but I have -- if

7      you are going to expand this into a Voting Rights Act case --

8            MR. WALKER:  Not right now.

9            THE COURT:  Again, I have said I see this twofold:

10     One, changed conditions; and two, has the law changed.

11     BY MR. WALKER

12     Q    Do you have your book of exhibits?

13     A    Yes, sir.

14     Q    Would you go to Exhibit 5?

15     A    Okay.

16     Q    You see under the Racial Demographics section that there

17     were two majority African-American zones?

18     A    Yes.

19     Q    Do you still have two?

20     A    Yes, sir.

21     Q    I see.  How many black members are on your board?

22     A    One.

23     Q    Are there any other minorities on your board?

24     A    No, sir.

25     Q    How many of your board members are with you today?

1    A      Three.

2    Q      Now, let's go to the next exhibit.  This is the

3    memorandum.  Now, what is this on Exhibit 7.  Is this the

4    students who are bused from Palestine to the Wheatley campus?

5    A      That's the fifth-grade students.  The front page is the

6    fifth grade, all of 7, yes.

7    Q      Now, do some of these students include the students from

8    Moro, Brinkley, Forrest City?

9    A      No, sir.  They -- it would not include anybody from

10   Brinkley, I wouldn't think, because Brinkley is closer.

11   Q      Does it include some of the other people?

12   A      It does include some out of district.

13   Q      So when parents bring their students to the Palestine

14   site, then they get on the bus and go to Wheatley?

15   A      Yes.

16   Q      And have you suggested that they just go on over to

17   Wheatley themselves?

18   A      No, sir.

19   Q      And the same would be true with respect to the sixth-grade

20   bus, the seventh-grade bus, and the eighth-grade bus.

21          MR. WALKER:  Your Honor, may I deviate here a moment?

22   I was under the impression that you allowed the district to

23   close one of the grades at the middle school.

24          THE COURT:  In 2006?

25          MR. WALKER:  Yes, ma'am.

1           THE COURT:  I don't remember that.  I have not

2      reviewed my order from 2006.

3         Mr. Bequette, were you -- I don't remember whether you

4      were representing the district at the time.

5           MR. BEQUETTE:  I was not.  There was an order entered

6      in, I want to say 20 --

7           THE COURT:  Was Frank Morledge the one who was

8      representing?

9           MR. WALKER:  Yes, ma'am.

10          MR. BEQUETTE:  That's correct.  Yeah.  In August 30,

11     2005, an order was entered allowing the ninth grade at the

12     Wheatley campus to be moved to the Palestine campus.

13          THE COURT:  That was by agreement.

14          MR. WALKER:  It was still --

15          THE COURT:  I think you agreed to that.

16          MR. WALKER:  I think so.  But there were four grades

17     then over there, and I think that they just swapped a grade.

18     You -- that's fine, Your Honor.  Let's move on from that.

19          THE COURT:  I say you agree, but the plaintiffs --

20          MR. WALKER:  The plaintiffs through me.

21          THE COURT:  Yes.

22     BY MR. WALKER

23     Q    Exhibit 9, is this a document that you say is prepared by

24     the Department of Education?

25     A    Yes.

1    Q    Now, this doesn't take into account -- this was done,

2    what, in January of 2012?

3    A    January 11, 2012, yes, sir.

4    Q    Does this take into account the rulings from Judge Dawson

5    that you presented with respect to choice?

6    A    No.

7    Q    All right.  You understand that he has invalidated choice

8    insofar as circumstances like this are concerned?

9    A    Yes.

10   Q    And that means if he is upheld and it's still the law of

11   the state, but it he is upheld, you will lose a lot of

12   students, won't you?

13   A    Yes.

14   Q    How many will you lose?

15        MR. RICHARDSON:  Just a clarification.  There was a

16   stay entered, and so the school choice is still in effect.

17        MR. WALKER:  I understand.

18   BY MR. WALKER

19   Q    Now, how many students will be affected by the School

20   Choice Act?

21   A    Mr. Walker, that's according to what the ruling is.  If he

22   said School Choice kids have to go back --

23   Q    Different question.

24   A    If it says you cannot take any more, this year we took

25   zero School Choice kids, and we are right at 670 or 665 right

1    now.  So we have maintained, and we are right along the lines

2    of what the projection says without any School Choice kids.

3    Q    But if the School Choice kids cannot stay, what does your

4    enrollment return to?

5    A    If it's like -- if that's like it was this year, it will

6    follow this enrollment projection on down and we will continue

7    to lose kids.

8    Q    So yours is not a growth district, is it?

9    A    No, sir.

10   Q    All right.  Exhibit 10, this comes also from the

11   Department of Education?

12   A    Yes, sir.

13   Q    Are you aware that the state department recommended that

14   you have what's known as a surplus that's approximately

15   5 percent?

16   A    Do not know what surplus -- what exact surplus should be.

17   Q    If your budget is 3 million or $4 million, 5 percent would

18   be 200 to $250,000.  Your surplus is, in all years, has been

19   far greater than that, hasn't it?

20   A    It has been, yes.

21   Q    And you said that you used stimulus money to give teacher

22   salaries?

23   A    Yes.

24   Q    Were you not aware that the stimulus money was for other

25   purposes?

1    A    We hired someone to deal with stimulus money.

2    Q    But you gave all the teachers and employees a raise?

3    A    No, no, no.

4    Q    Well, what did you do?

5    A    We paid teacher salaries out of -- we hired Norman Hill to

6    come in and -- that money was going away as soon as I got, as

7    soon as I was hired.  We had until, like, September to account

8    for that money.  So we hired Norman Hill, who works for many

9    different school districts dealing with that federal money.

10   And he came in and funneled it in and we paid teacher salaries

11   out of it and then we rolled it back in -- and that's how we

12   increased our bottom line.  But we increased our bottom line by

13   $100,000, where we got $450,000 of ARRA money.

14        THE COURT:  Are you saying that you had to spend that

15   money or lose it?

16        THE WITNESS:  Yes, ma'am.  If I would not have hired,

17   we would have lost that money, yes, ma'am.

18   BY MR. WALKER

19   Q    But you didn't do it to create new jobs?

20   A    No, sir.

21        THE COURT:  He preserved jobs.

22        MR. WALKER:  Yes, he preserved them.  It wasn't to

23   preserve.

24        THE COURT:  I am just joking.

25        MR. WALKER:  I understand, Your Honor.  Okay.

1    BY MR. WALKER

2    Q    Now, Exhibit 11, that's dated August 31, 2011.  Did you

3    receive any warnings from the State Department of Education in

4    writing regarding your failure -- your fiscal distress failure?

5    A    Sir?

6    Q    Have you received anything in writing from the Department

7    of Education which relates to having been put on probation or

8    having been given a warning?

9    A    We received this letter here.

10   Q    Are you familiar with -- this is ADE-282-1, Arkansas

11   Department of Education Rules Governing Standards for

12   Accreditation of Public Schools and School Districts?  Are you

13   familiar with this document that I will show you?

14   A    No, sir.

15   Q    Are you saying that you haven't seen the rules governing

16   standards for accreditation?

17   A    Seen?  Yes, sir.  Familiar with 40 pages --

18   Q    You are not familiar?

19   A    I am familiar with the document.  I am familiar that we

20   have rules.  I am not familiar with every rule.

21   Q    All right.  Now, in terms of the probation, are you on

22   probation or has this district been on probation?

23   A    Yes, we have been.  We are not right now.

24   Q    Has it been on probation since you have been there as a

25   superintendent?

1    A    I do not think, no, sir.

2    Q    Are you familiar with the specific timeframe for citations

3    of probation that begin at Section 24.0?

4    A    I would have to read this to know what you are talking

5    about, Mr. Walker.

6    Q    Just look at it.

7    A    This is dealing with licensure.  Yes, sir, I am somewhat

8    familiar with this.

9    Q    Well, you have --

10         THE COURT:  Can you turn up the air a little more?

11   Can you ask them?  I mean, I am a little hot.

12         Are you-all a little warm?  A little bit?

13         Thank you.

14   BY MR. WALKER

15   Q    Look at it.  It deals with more than license.  Start right

16   here on page -- it's not -- 282-26, various probations.  They

17   don't go to licensure.

18   A    The first one did.

19   Q    I have shown it to you, and you don't have to do anything

20   other than look at it.  You haven't received any citation from

21   the Board of Education, Arkansas Department of Education that

22   you are on probation, have you?

23   A    Not since I have been superintendent.

24   Q    And Mrs. Burnett is not in a position as a coordinator to

25   cite you, is she?  That has to come from the department itself,

1   doesn't it?

2   A    I don't know.  Ms. Burnett is the coordinator --

3   Q    Okay.  Now --

4   A    -- for fiscal distress accountability and reporting.

5   Q    Now, do you have anything in writing indicating that you

6   are about to be placed in fiscal distress?  Anything in

7   writing?  I will take this.

8   A    Hold on.  I am still looking at this, Mr. Walker.

9        Mr. Walker, what you have here is --

10  Q    Just a moment.  There is no question.  My question is,

11  have you had any writings from the Department of Education

12  which indicate that you are about to be placed on fiscal

13  distress?

14  A    I have two -- yes.  I have a letter.  I am -- if you don't

15  mind, I would like to keep that.

16  Q    I will give it to you afterwards.

17  A    Okay.  Yes, sir.  I have two letters saying that --

18  Q    Is one of them Exhibit 11?

19  A    One of them is Exhibit 11.

20  Q    Where does it say that you are about to be placed on

21  fiscal distress?

22  A    The second sentence says:  The purpose of this meeting

23  will be to discuss Palestine-Wheatley School District's

24  financial information and fiscal distress.

25  Q    To discuss the subject of fiscal distress?

1   A    Yes, sir.  We get these letters whenever we have triggered

2   early indicators for fiscal distress.

3   Q    Did you get another letter after August 31, 2011, and

4   before May 2012 indicating that you were being placed on fiscal

5   distress?

6   A    No, sir.

7   Q    All right.  So for the last year, you were not on fiscal

8   distress.  Did you receive a similar letter to that that you

9   have here as Exhibit 11 at the beginning of this school year?

10  A    Yes, sir.

11  Q    So isn't it fair to say that all the districts routinely

12  get this kind of letter?

13  A    No, sir.

14  Q    How do you know that they don't since you have never been

15  another superintendent?

16  A    I know the triggers that trigger a declining balance will

17  trigger these letters.  All school districts do not get these

18  letters.

19  Q    I am trying to understand where your declining balance is.

20  Will you draw my attention to that?

21  A    Yes, sir.  If you look at exhibit --

22  Q    Exhibit 10?  I don't see any declining balance of any

23  significance.

24  A    If you look at net legal balance at the bottom of the

25  page, in 06-07, it was $2,800,000.  07-08, it declined to

1    $2,460,000.   08-09, that's where we got the money for the

2    insurance on that field house.   It jumped up to $2,611,000.

3    10-11, it declined again to 2,398,000, decline of about

4    $200,000.   The following year it declined again about $400,000

5    to 1.9 million, and then this past school year, it went up

6    $100,000.

7    Q    Let me understand this.   This matter was before

8    Judge Wright in 2005-6.   The new balance was $854,000.   Then

9    every year since then it has been twice that amount.   So in

10   comparison to 2005-6 as to now, where is the material changed

11   circumstance between $850,000 that is adverse to the district?

12   Where is it?

13   A    It's a declining balance.

14   Q    Well, it hasn't declined since 2005-6?

15   A    It went up, but, see, we got over $2 million in insurance

16   money and that's where that came from.   We was also receiving

17   student growth money those years, and so we should have been

18   going up, Mr. Walker, but we was going down.

19   Q    Let me ask.   What is the percentage amount that you

20   understand as a superintendent you are supposed to have left in

21   your school district treasury at the end of the year?

22   A    I know -- I don't know what percentage you are supposed to

23   have of your budget.   I do not know.   That would be a better

24   question for some of my financial people.

25   Q    Well, aren't you supposed to expend most of your money

1   every year?

2   A    Mr. Walker, if you look at --

3   Q    Listen to my question.  Isn't it a matter of law that you

4   are to spend most of your money that you have in a given year

5   and you are not to have huge carryovers?  Is that the status --

6   A    If it is, we are right in line with the law because we are

7   spending more than we get.

8   Q    Your budget is how much this year?

9   A    Roughly $3 million.

10  Q    And you have a net legal balance of roughly $2 million?

11  A    Yes, sir.

12  Q    And you say that that's a declining balance, when you have

13  2/3 of the amount of your budget in a net balance?

14  A    Yes, sir.  It is a declining balance, and it can be seen

15  as that.

16  Q    Now, Exhibit 13, what did you say this is?

17  A    That is an accountability report from the Arkansas

18  school -- that's a new accounting -- new accountability system.

19  Q    Why is this here?  What are you trying to tell the Court

20  with this document?

21  A    Just shows from 2006, this wasn't around.  We was not on

22  Year 5 academic school improvement.  We was not a focus school.

23  Academically, this has changed since 2006 with the Lake View

24  and the accountability issues.

25  Q    Lake View was before 2006?

1  A    Right.  Palestine-Wheatley Middle School was not on school

2  improvement focus Year 5 before 2006.

3  Q    Well, how does that have to do with the consent decree?  I

4  think you said it didn't.  Does it have anything to do with the

5  consent decree?

6  A    You asked me, sir.

7  Q    I am asking you.

8  A    What are you asking me?

9  Q    Does this have anything to do with the consent decree?

10  A    Yes, sir.  It's a change of circumstances because --

11  Q    It's Year 5 rather than Year 4?

12  A    No, sir.  2005, we wasn't on Year 4.

13  Q    What year were you on?

14  A    We was not on a year.

15  Q    Were you on any year in 2004?

16  A    Not that I know of.  Not to the best of my knowledge in

17  reviewing my records.

18        THE COURT:  Does Defendant's Exhibit 13 reflect what

19  year?

20        THE WITNESS:  No, ma'am.

21  BY MR. WALKER

22  Q    How can you use this document to show that you were in

23  fifth-year improvement in fourth year?

24  A    This is this year's document.  I could have used last

25  year's document to show Year 5.  This is a new accountability

1    system put out by Tom Kimball that relabeled the schools and no

2    longer are Year 1, 2, 3, 4, 5.

3    Q    Tell me what this document says.  I am trying to

4    understand what its purpose is.

5    A    This document says that we had 69 percent of all of our

6    students proficient or advanced.

7    Q    Where does it say that?

8    A    In literacy, right here on the second section.  We had to

9    have 58 percent of them, so that's a -- that should be a green

10   deal right there.  So we met our AMO of 58 percent.

11   Q    Well, let me ask you this.  Is that -- you have already

12   acknowledged that this doesn't have anything to do with the

13   consent decree?

14        MR. BEQUETTE:  I object to the form of the question.

15   That mischaracterizes his testimony.

16   BY MR. WALKER

17   Q    Does this document have anything to do with the consent

18   decree in your opinion?

19   A    No, sir.

20        THE COURT:  Let me inject here.  I don't -- it doesn't

21   matter to the Court whether for him -- it's up to me, really,

22   whether this is a changed circumstance.  He may testify about

23   it, but that's a question for the Court to determine.

24        MR. WALKER:  Yes, ma'am.

25        THE COURT:  And for you to argue about.

```
 1              MR. WALKER:  I am trying to understand the document,
 2   Your Honor.
 3              THE COURT:  Sure, I am too.  I don't understand all of
 4   it either.
 5   BY MR. WALKER
 6   Q    Now, Exhibit 16, what does that document -- and where does
 7   it come from?
 8   A    That's funding matrix.  I actually got that from a -- it
 9   comes from the Department of Education as well.
10   Q    Well, what is it?
11   A    If you look at school size, it's the same thing you were
12   going through with your standards, Mr. Walker.  It breaks
13   down -- look at FY12, a school size, it tells you how many
14   teachers you should have and how you will be funded according
15   to the funding matrix.  This is how schools are funded.  This
16   is the equations of how schools are funded.
17   Q    Well, I don't know what this means, but I am trying to
18   understand how this relates to the consent decree or changed
19   circumstances.
20   A    Well --
21   Q    Let me see if I can deal with you.  I will just --
22              MR. BEQUETTE:  He asked him how it relates to the
23   consent decree.  I would like him to let the witness answer
24   that question.
25              MR. WALKER:  I am withdrawing the question, Your
```

1    Honor, and going through the document.

2              THE COURT:  All right.

3    BY MR. WALKER

4    Q    Now, in the first category, the first column, 08, FY08,

5    bottom line says:  Grades 4-12 equals 69 percent students.  For

6    each year all the way over, it's 345.  The same thing is for

7    the second major line, says:  Total classroom teachers.  And it

8    says 24.94 on all of them.  Throughout this whole document, the

9    same line -- the same number is repeated, at least in the

10   first -- yes.

11        Now, if the same circumstance is repeated, how does this

12   have anything to do with anything?

13   A    This is how you -- this is how funding is set up.  This is

14   the funding equation, funding matrix for funding schools in the

15   state of Arkansas.  If you want me to explain, I can.

16   Q    Isn't this just a document showing to you, from the

17   Department of Education, how you get funding?

18   A    It is a -- the funding matrix, yes, sir.

19   Q    But it has nothing to do with the way your district

20   operates or has applied it, does it?

21   A    Yes, sir.  It shows how much we get for transportation on

22   $303.  You can see that has gone up every year.

23   Q    You get more now for transportation?

24   A    You get the same amount as every other school.

25   Q    Well, how much does it cost you per student to transport a

1    student?

2    A    It costs $3.60 a mile to run a bus anywhere, per student.

3    I don't know.

4    Q    Well, you get $300-some per student for transportation,

5    don't you?

6    A    Yes, sir.

7    Q    So you are not able to tell the Court how much you

8    actually spend for transportation?

9    A    No, sir.

10   Q    How is that a changed circumstance?

11   A    I didn't say it was a changed circumstance.

12        MR. WALKER:  Just a moment, Your Honor.

13   BY MR. WALKER

14   Q    I have found some interest in the fact that you spend

15   $16,800 roughly per student per year; is that correct?

16   A    Yes, sir.

17   Q    Did you know the state average for education for children

18   is considerably less than $12,000?

19   A    Yes, sir.

20   Q    And you are saying that this is a poor school district

21   with a real significant economic problem that's a changed

22   circumstance?

23   A    Yes, sir.

24   Q    Just a moment.

25        MR. WALKER:  No other questions, Your Honor.

1          THE COURT:  All right.  Mr. Richardson?

2    BY MR. RICHARDSON

3    Q     Just two quick ones.  Exhibit 9.

4    A     Yes.

5    Q     Is that from your facility's master plan?

6    A     You can get one there.  That's not where I got this one,

7    but that's where it is located.

8    Q     But this is a document that supports your facility's

9    master plan?

10   A     Yes.

11   Q     And in doing that, it projects out this enrollment to help

12   the district determine what its facility's needs will be in ten

13   years?

14   A     Yes.

15   Q     And the department prepares these numbers in support of

16   that analysis as part of your facility's master plan; is that

17   right?

18   A     Yes, sir.

19   Q     There have been a lot of questions about Exhibit 16.  You

20   don't get separate funding for this transportation; is that

21   right?

22   A     Yes, sir.  We are -- no, sir, we do not get separate

23   funding for transportation.

24   Q     That's part of the foundation funding that you receive,

25   right?

1    A    Yes.

2    Q    And the -- you are not required to spend that $303 on each

3    student for transportation, right?

4    A    Right.

5    Q    And if you don't spend that $303, then that's money that

6    you can use other places in your budget, right?

7    A    Right.

8    Q    And same thing is true for each element of that matrix.

9    The less you spend on each line item, the more becomes

10   available for other purposes; is that right?

11   A    Yes.

12            MR. RICHARDSON:  I hope that -- I think there was some

13   confusion about that document.

14            THE COURT:  This is not surprising in school

15   litigation, and it's very frustrating for someone who wants to

16   trace funds to application where they're designated.  And this

17   seems to designate the $303 per student for transportation, but

18   obviously the district doesn't have to spend that on

19   transportation.  It can spend it how it wants.  Just the same,

20   I keep bringing up the Little Rock School District litigation.

21   At one time I wanted, as the Judge, wanted to make certain that

22   the desegregation funds were spent on desegregation, and the

23   Eighth Circuit said that was not necessary for the district to

24   show.  So this is -- it's very frustrating.

25            MR. RICHARDSON:  I hear you.  If the Court has other

1   questions about the matrix or school funding, I can answer

2   those questions.  We can provide whatever information is

3   necessary.  The matrix is part of a funding model of what the

4   general assembly assumes a prototypical school will spend in

5   each of these areas in order to meet the standards of

6   accreditation.

7            THE COURT:  It's probably better that we have a

8   witness instead of a lawyer explaining it.

9            MR. RICHARDSON:  True.

10           THE COURT:  So that's what I would prefer.  There will

11  be a witness, I believe, someone from the Department of

12  Education.

13           MR. RICHARDSON:  I don't know that it's -- I don't

14  know how relevant it is to this proceeding, so I don't know

15  that we need to spend time doing that unless Your Honor has

16  questions.

17           THE COURT:  If it is somehow relevant to changed

18  circumstances -- and I believe that the district's position is

19  that it has been marked as a school that could be in, at least

20  in a preliminary fashion, in fiscal distress and subject to

21  being merged with a neighboring district in accordance with the

22  Arkansas law.  I can't remember what that law is called, but it

23  came in the aftermath of the Supreme Court's decision in the

24  Lake View case requiring adequate school funding and adequate

25  standards.

1           MR. BEQUETTE:  That's correct.

2           THE COURT:  But I don't remember what the law is

3    called.

4           MR. RICHARDSON:  It's the Arkansas Fiscal Assessment

5    and Accountability Program, Arkansas Code Annotated 6-20-1901.

6           THE COURT:  Thank you.  But that's what -- I mean, as

7    I understand the district's arguments.  So I don't know that I

8    need to understand everything in that matrix, but it might be

9    relevant to the district's argument that, if things continue

10   under the consent decree, the district will not be able to

11   survive under the requirements of Arkansas law.

12      It's 5 minutes of 2:00.  I have a hearing downstairs at

13   2:00 o'clock.  Do you have any more questions, Mr. Richardson?

14          MR. RICHARDSON:  No, ma'am.

15          THE COURT:  We will take you up on redirect, then,

16   when we get back.  Let's shoot for 2:30; is that all right?

17          MR. BEQUETTE:  That would be great.

18          THE COURT:  Court is in recess.

19      (Recess at 1:55 p.m., until 2:30 p.m.)

20          THE COURT:  All right.  Mr. Bequette, do you have some

21   redirect for Mr. Estes?

22          MR. BEQUETTE:  I do, Your Honor.

23          THE COURT:  All right.  Mr. Estes, please resume the

24   stand.  I know you are probably tired of this.

25                    REDIRECT EXAMINATION

1    BY MR. BEQUETTE

2    Q    Mr. Estes, can you state the reasons why the elementary

3    school building under construction currently was not built in

4    Wheatley?

5    A    The Wheatley people voted for it 4 to 1 -- voted against

6    it 4 to 1, construction of a new building, 40 something to 10

7    votes.  The majority of the population -- the vast majority of

8    the population at the school we will serve will be closer to

9    the Palestine campus.

10           THE COURT:  But they all have to pay for it, right?

11           THE WITNESS:  Yes.

12   BY MR. BEQUETTE

13   Q    All right.  Mr. Estes, are you aware of any rule-of-thumb

14   recommendation or standard as to what percentage of your annual

15   budget should be, you know, held in reserve as an ending

16   balance?

17   A    No.

18           MR. BEQUETTE:  No further questions.

19           THE COURT:  All right.  Mr. Walker?

20           MR. WALKER:  No more questions.

21           THE COURT:  Mr. Richardson?

22           MR. RICHARDSON:  No, ma'am.

23           THE COURT:  All right.  Mr. Estes, you may stand down,

24   and I don't believe you will be called back today.

25       You may call your next witness, Mr. Bequette.

1      MR. BEQUETTE:  Hazel Burnett.

2      THE COURT:  Please come forward and I will swear you

3  before you sit down.

4          **HAZEL BURNETT, DEFENDANT'S WITNESS, DULY SWORN**

5                   DIRECT EXAMINATION

6  BY MR. BEQUETTE

7  Q    Would you identify yourself for the record, please.

8  A    Hazel Burnett, Department of Education.

9  Q    And how long have you been employed at the Department of

10  Education?

11  A    I was originally employed in 2001.  I had a year and a

12  half that I left and then came back to the department in

13  2004-2005.

14  Q    And what different kinds of positions have you held and

15  work have you performed at the department?

16  A    I managed a fiscal distress program, and that's pretty

17  much the unit that I have been in the full time.

18  Q    Describe to the Court what kind of duties are entailed in

19  managing the fiscal distress department of the department?

20  A    The fiscal distress program was created in mid '90s to

21  identify districts with some financial issues.  We identify,

22  assess, we place them in a program, and hopefully catch it

23  before it gets so bad that the district can't recover.

24  Q    I see.  And you have heard mention in the testimony in the

25  court today about the fiscal assessment and accountability

1    program passed by the general assembly some years ago.  Can you

2    describe to the Court what that basic program is since that's

3    what your division of the department monitors?

4    A    Basic -- excuse me.  Basically it's like I said.  We

5    identify the districts with possible financial issues, bring

6    them in, review.  Once identified -- a district is identified,

7    we then take it to the state board for classification.  Once a

8    district is classified, they have to submit a fiscal distress

9    plan.  We work with the districts to implement a plan to help

10   turn the districts around.  There are lots of fiscal distress

11   indicators.  The majority is a declining balance, but there are

12   other material indicators such as not meeting minimum teacher

13   salary fund, salary payments, defaulting on debt, financial

14   records inadequate.

15   Q    I see.  Can you open up the exhibit packet there to

16   Exhibit No. 11, Defendant's Exhibit 11?

17   A    Okay.

18   Q    Do you recognize Defendant's Exhibit 11?

19   A    Yes.

20   Q    What is it?

21   A    That is a letter a couple of years ago on, in -- within

22   the fiscal distress program, we created an early intervention

23   program.  The early intervention program is if in a district we

24   see two or more nonmaterial indicators, it's a department's job

25   or the superintendent's job to get together and discuss to see

1    if they need to be in an early intervention program.  That's a

2    step before the fiscal distress.  So this letter was sent out

3    with that early intervention piece.

4    Q    Why did you send this letter?

5    A    We saw indications of a declining balance and audit

6    issues.

7    Q    I see.  And did you have a meeting with any

8    representatives of the Palestine-Wheatley School District?

9    A    Yes.

10   Q    And tell us what happened at that meeting.  What was

11   discussed?

12   A    Well, we -- I -- you know, that's been a year ago, two

13   years ago, but the district was not placed in early

14   intervention.  They provided enough documentation that we felt

15   like they should not be a candidate for the program at that

16   time.

17   Q    And do you recall exactly why that was?

18   A    They had some audit findings.  I believe they were

19   corrected -- or they had sent a correction to justify that.

20   You have to file a plan after you have audit findings, and the

21   declining balance, they had said that their budget that they

22   had submitted by the time we met showed that they would show an

23   increase in the balance.  But I don't remember exactly what it

24   was, but it was sufficient enough that we didn't feel like they

25   should be placed in the system.

Burnett - Direct

1  Q    Has your fiscal accountability division at the department

2  had any subsequent contact from this August 31, 2011, letter

3  and then your meeting following that letter with the district

4  since that time?

5  A    Yes.  On August the 31st, 2012, I mailed another letter

6  asking the district to come in and visit with us.  A meeting is

7  scheduled in October.  We haven't had it yet.  At the time I

8  did my pull for fund balances, which was mid August, the books

9  were not closed.  So it wouldn't be a final balance, but at

10  that time I could see a small decline and, again, audit

11  findings.  We have not made a determination on that.

12  Q    Explain to the Court why it is that declining fund

13  balances for any district or Palestine-Wheatley School District

14  would be a concern of the department's?

15  A    Well, I don't know how to describe.  A declining balance

16  means you are spending more than what you are bringing in.

17  Q    Right.

18  A    And that can lead to not being able to meet your financial

19  obligations.

20  Q    If you could turn back to Exhibit 10.

21  A    Yes.

22  Q    Do you recognize this -- this exhibit?

23  A    Yes.

24  Q    What is it?  What is this exhibit?

25  A    This is historical data.  Most of this was arrived from

1    the annual statics report published by the department.  And it

2    just is not the full annual statistical report, but it is

3    pieces of that that just show some trend and history data.

4    Q    Were you present for Mr. Estes's testimony when he

5    testified about, in a couple of years where the district's fund

6    balance or ending balance actually increased slightly, that it

7    was the result of certain nonrecurring revenue influxes into

8    the budget?

9    A    Yes.

10   Q    Would that concern your department or your division of the

11   department when nonrecurring revenue is infused into the

12   budget?

13            THE COURT:  Just a minute.  What is that?

14            MR. WALKER:  It's my phone.  I thought it was off, and

15   it wasn't.  I am sorry.

16            THE COURT:  I just wanted to make sure no one was

17   trying to record something that's in here.  Newspaper reporters

18   are allowed to, but --

19        Go ahead.

20            THE WITNESS:  There is a lot of indicators and each

21   district is unique in its own way.  And, yes, one-time shot in

22   the arm for financial, you know, money coming in, we always

23   factor that in or out, just as sometimes a balance will drop

24   due to capital outlay expenditures.  So we always review those

25   pieces of all the components.

1    BY MR. BEQUETTE

2    Q    Right.  Thank you.

3         MR. BEQUETTE:  Pass the witness.

4                       CROSS-EXAMINATION

5    BY MR. WALKER

6    Q    How are you today, Ms. Burnett?

7    A    I am okay.

8    Q    How long have you been in the Department of Education?

9    A    I started in 2001, and I left in 2004 for about 18 months

10   and came back October -- or 2005.  Been there ever since.

11   Q    How long have you been the coordinator?

12   A    Pretty much the full time.  I have been in the fiscal

13   distress unit over at the -- that was what I was hired for,

14   yes.

15   Q    So the fiscal distress unit was there in the '90s, you

16   say?

17   A    Yes.

18   Q    And it has continued throughout?

19   A    Yes.

20   Q    Do you -- can you tell the Court how many times, based on

21   your review of the records and knowledge, Palestine-Wheatley

22   has been in fiscal distress as determined by the definition of

23   that term by your agency?

24   A    They have never been identified as in fiscal distress.

25   Q    I see.  How many times have they been given a warning

1   letter for being on the verge of being in fiscal distress, if

2   there is such a thing?

3   A    I have mailed two letters for the early intervention

4   piece, for a visit.

5   Q    Early intervention does not -- the next step is not being

6   placed on --

7   A    No.

8   Q    How many steps are there before you get the Department of

9   Education to designate a school district as being in fiscal

10  distress?

11  A    Well, the early intervention program was developed to

12  identify a district by August the 31st once the financial data

13  is completely finished, and we try to catch it as early as

14  possible.  In January is usually when we start our

15  identification process for fiscal distress.  We will call the

16  district, have them come in for a conference, visit with them.

17  We may ask for additional information, and then we identify and

18  the state board classifies.

19  Q    I see.  So they were two steps removed from the state

20  board's classification in 2011.  Is that fair to say?

21  A    I am sorry.  What?

22  Q    Well, if the state department is the one that classifies

23  the district as being in fiscal distress --

24  A    Yes.

25  Q    -- the closest this district has come during your tenure

1    is two steps from that.

2    A    They have not been placed on early intervention at all.

3    Q    All right.  But early intervention is really just -- sort

4    of like a discussion is first and then notice of early

5    intervention?

6    A    If the district is placed on early intervention, the law

7    says that they will notify their board at the next regular

8    meeting and we offer technical assistance to help them.

9    Q    You haven't got to that step yet at all, have you?

10   A    No, sir.

11   Q    Go to Exhibit 11 -- Exhibit 10 in the book in front of

12   you.  Are you familiar with this document?

13   A    Yes.

14   Q    Did you prepare it?

15   A    I did not prepare it, no.  The department does.

16   Q    Under Expenditures, the expenditures are reflected in this

17   document; is that correct?

18   A    The per pupil expenditures are, yes, sir.

19   Q    The total expenditures are also?

20   A    Yes.

21   Q    All right.  Now, this is what the district has reported to

22   you?  These figures reflect what the district reported to you;

23   is that correct?

24   A    These are a result of the information submitted to the

25   department, yes, sir.

1  Q    I see.  Now, you-all don't verify these expenditures.  You

2  just accept what has been submitted, is that fair to say,

3  unless someone is placed in early intervention actually or in

4  fiscal distress?

5  A    This document is not -- we use this as historical data,

6  but it's created for all districts in the state.

7  Q    Oh, I understand.  But that -- but what you-all do is

8  require the districts each year to tell you what their total

9  expenditures for the last year were?

10  A    Yes, sir.

11  Q    What their budget for the next year is?

12  A    Yes, sir.

13  Q    And you-all don't go and audit those for every district

14  each year, do you?

15  A    We do the budget.  You have to have an approval budget,

16  yes, by February the 15th.

17  Q    Now, in 2005-6, according to this document, there was a

18  legal balance of $854,000.  By my mental calculations, that is

19  close to 20 percent, 18 percent.  Would you agree?

20  A    Of their expenditures?

21  Q    Yes, ma'am.

22  A    Okay.

23  Q    Now, isn't there a rule of thumb in the department that

24  school districts should aim for a surplus of approximately 5 to

25  8 percent per year?

1    A    No, sir.

2    Q    What is the rule?

3    A    To my knowledge, there is not.

4    Q    Is there any balance that a district must have?

5    A    No, sir.

6    Q    Have you ever known of such a balance?

7    A    No, sir.

8    Q    All right.  So a school district can just operate without

9    spending any of its money?

10   A    I didn't say that, but --

11   Q    Well, we have here 2000 -- or at least $854,000 that's a

12   legal balance in 2005-6, which represents 20 percent of the

13   income.  How can it be a declining balance when your expenses

14   go up and your net legal balance goes up?

15   A    Typically, we begin our review with a trend data of about

16   three years.  So the year that you are talking about, whenever

17   we're talking about the letter that was mailed in '11, that 5-6

18   year would not have been included in that trend data.

19   Q    Well, there are no three years where there is a declining

20   balance, is there, unless you begin in '09?

21   A    There are other indicators on fiscal distress besides.

22   Q    I am only dealing with this one.

23   A    Okay.

24   Q    Now, at the time you wrote the letter, there was nothing

25   to indicate that the legal balance was a major concern of the

1    Department of Education; isn't that correct?  The legal

2    balance?

3    A    There was a decline from the previous year, yes.

4    Q    Well, if a district has -- a district that has a budget of

5    $6 million -- $6,000,600, has a balance of almost $2 million,

6    just on the face of it, that's not an indication of any

7    concern, is it?  Well, let me go another way.  Little Rock has

8    historically had a budget of $300-plus million dollars, and

9    they have a balance of between 12 and $20 million.  Is there

10   any requirement of consistency in balance between school

11   districts?

12   A    The project -- or the ending balance is unique for each

13   school district.

14   Q    I see.  So whether or not it's declining or not is

15   something for the district itself to determine, isn't it?  Not

16   you?  You-all basically simply say these numbers don't -- these

17   look suspicious, and since they look suspicious we want to talk

18   to you about them.  That's basically all you have done in this

19   district, isn't it?

20   A    At this point we have had discussion.

21   Q    All right.  I don't think --

22   A    Or we are planning to have discussion.

23   Q    All right.  Now, what's the concern if this district has a

24   budget of 6 million and a half dollars and they have got a

25   balance in the bank of almost $2 million, that's almost a third

1    of the budget.  Doesn't that indicate that they can operate for

2    a very long time, on the basis of their enrollment, whatever it

3    is between 500 and 600?

4    A    Well, a declining balance is less than the previous year's

5    balance, so therefore it is a declining balance, I would say.

6    But a percentage-wise, it may be small.  But there are other

7    indicators on fiscal distress besides declining balances.

8    Q    Now, tell me any other indicators you have discussed with

9    the superintendent, Mr. Estes, other than declining balances

10   regarding fiscal distress?

11   A    Early audit findings.

12   Q    What are some of those audit findings?

13   A    One of the audit findings was a repeat on misstatement --

14   I -- just a second.  Let me think about it.  Misstatement of

15   their accounting records.

16   Q    They misstated their records to you?

17   A    In other words, there is some maybe coding issues or --

18   Q    And what else?

19   A    Those are the two pieces that got our attention to ask the

20   district to come in and talk to us on October.

21   Q    Now, I notice here on this document that there is a

22   category called nonfederal certified FTE's.

23   A    Okay.

24   Q    An FTE is a full-time certified employee.

25   A    Full-time employment, yes sir.

1   Q    And in '05, this district had 41, almost 42 full-time

2   certified people, right?

3   A    Yes.

4   Q    And its enrollment was more than 500-some students.  And

5   then that number jumped from 41 to almost 61.  In other words,

6   a third.  You would expect this district, if it's in distress,

7   not to be able to employ so many more teachers, wouldn't you?

8   A    I don't have an opinion on that.

9   Q    Well, all right.  And the same thing is true for

10  nonfederal classroom -- certified classroom FTE's.  I am trying

11  to see anything here that seems to be extraordinary other than

12  that you-all want to just keep up with these districts and see

13  that, if they have some problems, you can help them with it

14  before they get to the point of being in jeopardy.  Is there

15  anything on this balance sheet that does that?

16  A    I -- we have not reviewed this information to determine,

17  and that's what we do at the meeting in October.

18  Q    Tell me this.  When the balance sheet jumps from 2005 to

19  '6, from 854,000 to $2,809,000 in one year, when the only

20  difference in increase of -- only difference in increase of

21  expenditures was $400,000 or less, did you-all see that as a

22  concern?  An increase of $2 million in the legal balance sheet?

23  A    I am sure it was looked at, yes.

24  Q    And you-all would have sent a letter on that too, wouldn't

25  you?

```
 1    A    We review the information, yes, sir.  As far as a detail

 2    of doing it back in '06 or '07, I don't remember that, sir.

 3              MR. WALKER:  I see.  I don't have any more questions.

 4              THE COURT:  Mr. Richardson?

 5    BY MR. RICHARDSON

 6    Q    School districts are required to have their finances

 7    audited every year, correct?

 8    A    Yes, sir.

 9    Q    Do you know who does that?

10    A    I believe legislative audit does theirs.

11    Q    The state legislative audit?

12    A    Yes.

13    Q    Plaintiffs' Exhibit 11, do you remember how many of those

14    letters went out in 2011?

15    A    For Year 11 or Year 12?

16    Q    Year 11.

17    A    Year 11, I do not remember how many.  I mailed them

18    letters.  We identified five districts in early intervention.

19    Q    Do you remember how many letters that you sent out this

20    year?

21    A    11.

22    Q    Okay.  Thank you.

23              THE COURT:  Mr. Bequette?

24                        REDIRECT EXAMINATION

25    BY MR. BEQUETTE
```

1  Q    Ms. Burnett, I would like you to turn back to Defendants'

2  Exhibit 10.

3  A    Okay.

4  Q    Now, from school year 2009-2010 to 2010-2011, how much was

5  the decline in the district's net legal balance during that

6  year?

7  A    When you say how much --

8  Q    Well, it went from 2 point almost 4 million to a little

9  over 1.9 million.

10 A    That's a half a million dollars.

11 Q    Right.  And if that burn rate of the district's decline

12 continues, how long would that -- would the district -- how

13 long could the district go before it spent its entire ending

14 balance?

15 A    Well, it wouldn't take -- at that point it would be about

16 four more years or so.  But the thing to remember is there are

17 so many factors into those balances, such as a one-time shot of

18 the stimulus money or other factors that can play into that.

19 Q    But if this trend continued --

20 A    They would be headed for fiscal distress down the road.

21        MR. BEQUETTE:  No further questions.

22        MR. WALKER:  Your Honor, if I may?

23                        RECROSS-EXAMINATION

24 BY MR. WALKER

25 Q    I call your attention to that same Exhibit No. 10.

1    A    Uh-huh.

2    Q    And in the year 2011 -- 10-11, the category says $9,681

3    for pupil expenditures.

4    A    Yes.

5    Q    Is that pretty much what the average in the state of

6    Arkansas is?

7    A    I don't remember what the average is, sir.

8    Q    Is it within the range?

9    A    I really don't remember what the average is.

10   Q    All right.  And then it says total expenditures

11   $6,664,000.  Does that include construction?

12   A    I would have to look at the information that aggregates to

13   this, but I do not believe it does.

14   Q    All right.  Then it says the balance at the end is

15   $1,978,398.  That was a 2010-2011 school year.  The 2011 school

16   year ended in June of 2011?

17   A    Yes.

18   Q    This petition was filed in 2012, and the argument is that

19   it's a declining balance.  Go to Exhibit 11.  I'm sorry.  Go to

20   the next page, Exhibit 10, second page.  You see the

21   expenditures $6,600,000 and this year the expenditures jump up

22   to $10 million?

23   A    I have no idea what this document -- we did not create the

24   document at the department.

25   Q    It says historical data.  You don't know what page 2 comes

1    from?

2    A    I didn't -- that does not -- is not a piece of the annual

3    statistical report as the other information is.  The annual

4    statistical report is published in February of -- by

5    February 15, and it has not been published at this time.  That

6    would include the 11-12 information.

7    Q    It's presented by the district, so let me go through it.

8    It says:  For pupil expenditures, $16,692.  If that is fact,

9    then the amount has gone up in one year since Ms. Estes has

10   been there from 9,681 to $16,000.  Is that unusual?

11   A    I would think it would be, yes.

12   Q    Is that an indicator of something happening that may cause

13   your unit some concern?

14   A    I have no idea where the number -- I didn't do the

15   calculation or -- I am not familiar with it, so --

16   Q    I didn't either.  Now, it also says that the net legal

17   balance is $2,069,000.  Well, in 2011, it's $1,978,000.  So

18   that means it's not a declining balance as between this year,

19   2012, and last year.

20   A    When we do our early intervention piece, we have to mail

21   the letter by August 31st.  I have to review all of the

22   districts.  Therefore, I make a pull from the databases by

23   August 15, and their financial records are not closed at that

24   time.  They can make a lot of adjusting entries in-between

25   time.  At the time we made the pull, there was a decline.  I

1    don't remember how much it was, but there was a decline.

2    Q    If you have an insurance proceed payment, is that supposed

3    to be regarded as a net legal balance or is it supposed to be

4    put in some other category?  We had here a fire.  $2 million

5    comes into the district.  That's not to go into the balance

6    sheet, is it?

7    A    That would be a local decision.  I am not sure how you

8    would calculate that.

9    Q    At least on a ballot sheet, you have the building

10   destroyed.  Money for that building to be theoretically

11   replaced and then you put it over there and then it follows

12   itself into a net legal balance.

13   A    That would not be a determination we would make.  It would

14   be a local decision.  If that building was something that was

15   not necessary, I guess, you might not want to replace that

16   building.

17   Q    That's the point.  Thank you.

18        THE COURT:  Mr. Richardson?

19        MR. RICHARDSON:  No, ma'am.

20        MR. BEQUETTE:  No further questions, Your Honor.

21        THE COURT:  All right.  May she be excused?

22        MR. BEQUETTE:  She may be excused.

23        THE COURT:  You're excused.

24        MR. WALKER:  She may be excused.

25        THE COURT:  You are free to go, Ms. Burnett.  Thank

1    you very much.

2        Next witness?

3        MR. BEQUETTE:  Your Honor, we would move for admission

4    of Defendants' Exhibits 1 through 16, and that concludes our

5    evidence presentation today.

6        THE COURT:  All right.  I know that there was an

7    objection to Exhibit 2, and I conditionally received it.

8    Mr. Walker, do you want to have any -- do you want to say

9    anything more about Exhibit 2?

10       MR. WALKER:  Your Honor, in view of the fact that you

11   said that you may allow me to address the Voting Rights Act

12   independently, differently, I would not have any objection.

13       THE COURT:  Well, to say -- let's get this straight on

14   the Voting Rights Act.  Part of the consent decree is that

15   there will be single member districts in accordance with the

16   Voting Rights Act.  The request to modify or terminate the

17   decree does not focus on that.  What the modification is is

18   that the Court permit the district to close the school in

19   Wheatley and anything that relates to the school existing in

20   Wheatley would be modified, but I don't believe that the

21   district is asking the Court to permit multimember districts or

22   any multimember districts or any violations of the Voting

23   Rights Act.

24       Am I correct?

25       MR. BEQUETTE:  That is correct, Your Honor.

1    THE COURT:  All right.  Would you stipulate,

2  Mr. Bequette, that your district remains committed to single

3  member districts drawn in accordance with the Voting Rights

4  Act?

5    MR. BEQUETTE:  Absolutely.

6    MR. WALKER:  Same.

7    THE COURT:  That means it's not part of this case.  If

8  you think he has messed up or the district has messed up, that

9  would be another action.  Are you following me?

10    MR. WALKER:  Yes, ma'am.  That's fine.

11    THE COURT:  Okay.  Let's take up the other exhibits.

12  Do you have any objection to Defendants' Exhibit 1, which are

13  minutes from February 13, 2012?

14    MR. WALKER:  We will stipulate they can all be

15  admitted.

16    THE COURT:  All right.  They're all received.  I

17  understand your objection to Exhibit 2, but Mr. Walden was

18  testifying, according to Mr. Bequette, just to explain the

19  basis for these maps.  So I am going to permit that.

20    (Defendants' Exhibits 1 through 16 received in evidence.)

21    THE COURT:  Do you have any evidence you would like to

22  present?

23    MR. WALKER:  Yes, Your Honor.  I would like to call

24  one of the board members.

25    THE COURT:  All right.

1          MR. WALKER:  The president of the board.

2     The vice president of the board.

3          THE WITNESS:  I am Vernon Thweatt, vice president

4     currently.

5          MR. WALKER:  That's fine.  You will be the one.

6          MR. BEQUETTE:  Your Honor, Mr. Walker never listed any

7     witnesses.

8          THE COURT:  That's correct.

9          MR. WALKER:  I did indicate, Your Honor, I would call

10    witnesses they had.

11         THE COURT:  Well, is he listed as a witness on the

12    witness list?

13         MR. WALKER:  Yes, ma'am.

14         THE WITNESS:  Your Honor, I have no previous knowledge

15    whatsoever, no documentation, nothing.  I just happened to come

16    because I support the school.

17         MR. WALKER:  That's fine.  I will take that as a

18    stipulation, and ask for Ms. Burnett -- not Ms. Burnett.

19    Mr. Hughes.

20         MR. BEQUETTE:  He is not here.

21         MR. WALKER:  Beardsley.

22         MR. BEQUETTE:  He is not here.

23         MR. WALKER:  Debbie Loewer, Ms. Loewer.

24         THE COURT:  Good afternoon, Ms. Loewer.  Please come

25    up here, and I will swear you.

1          Mr. Bequette?

2               MR. BEQUETTE:  Mr. Walker didn't list any witnesses.

3               MR. WALKER:  I didn't.  I told the Court we would use

4     yours.

5               THE COURT:  Let me swear her, and we will talk about

6     whether she can testify.

7          **DEBBIE LOEWER, PLAINTIFFS' WITNESS, DULY SWORN.**

8               THE COURT:  All right.  Please be seated.

9          Mr. Walker, I believe you were out of time, and you say in

10    your letter dated yesterday that you were in receipt of the

11    district's witness list and exhibit list.  And I am quoting in

12    the letter, "I intend to possibly call Ms. Dorothy Smith, a

13    former school board member, and to cross-examine the

14    defendants' witnesses."  And then you say, "The Court is

15    reminded that I have a pending request to undertake discovery

16    in this matter.  I also ask the Court to allow this letter to

17    serve as a response to the Court's requirement that I provide

18    you same by noon today.  I beg the Court's forgiveness.  I have

19    been involved in other matters that keep me from addressing it

20    before now.  There should be no prejudice to the defendants."

21         Now, you did not list Ms. Loewer as a witness.  You said

22    you would cross-examine defense witnesses, and you wanted to

23    call Ms. Dorothy Smith, who I believe has served also as a

24    principal or is serving as a principal of the middle school; is

25    that right?

1          MR. WALKER:  No, ma'am.  That's Ms. Zenna Smith.

2     Dorothy Smith was a former school board member.

3          THE COURT:  Okay.

4          MR. WALKER:  I did this morning share with

5     Mr. Bequette and the Court a list of witnesses and exhibits,

6     and on there I indicated that I reserved the right to call the

7     witnesses listed by the defendants.

8          THE COURT:  I'm sorry.  I didn't see that.  I don't

9     have that up here.

10         MR. BEQUETTE:  Your Honor, I haven't seen it either.

11    This is news to me.

12         MR. WALKER:  Well, Your Honor, I -- I mean, I will be

13    cross-examining this witness anyway.

14         THE COURT:  Well, you were going to cross-examine the

15    witnesses called by the defendants.  Now, tell me -- this is --

16    admittedly, I called this hearing pretty quickly, and I told

17    you why I did.  What is it that this lady might know that you

18    think might be pertinent?

19         MR. WALKER:  I would like -- I think that she would be

20    in a position to address the issue of changed circumstances.

21         THE COURT:  All right.  Well, I am -- over

22    Mr. Bequette's objection, I am going to let you question this

23    witness, and he may cross-examine her.  But if I deem this

24    information to be -- I am permitting you to do discovery before

25    the Court, is what I am permitting.  You are doing your

1   discovery now, and it is just 3:00 o'clock.  I say just 3:00.

2   So I am going to let you go ahead and do it because I told you

3   I would take up this matter of discovery, and if you think she

4   knows about changed circumstances, I will permit you to ask her

5   on that narrow question.

6           MR. WALKER:  Yes, ma'am.

7           THE COURT:  And it might not be that narrow a

8   question, but on that area.

9                        DIRECT EXAMINATION

10  BY MR. WALKER

11  Q    State your name, please.

12  A    Debbie Loewer.

13  Q    Ms. Loewer, are you a member of the Board of Education of

14  the Palestine-Wheatley School District?

15  A    No, sir.

16  Q    What do you do for Palestine-Wheatley?

17  A    I am the district treasurer.

18  Q    Oh, you just work for them?

19  A    Yes.

20  Q    You are not a board member?

21  A    No.

22          MR. WALKER:  Your Honor, she would not help.  Thank

23  you.

24          THE COURT:  Do you have any cross-examination?

25          MR. BEQUETTE:  I do not, Your Honor.

```
1         THE COURT:  All right.  Thank you.

2     Anything more, Mr. Walker?

3         MR. WALKER:  Is there another board member here?

4         THE COURT:  They're probably lying low.

5         MR. WALKER:  Is the gentleman -- yes, sir.  Which one

6   was here in 2005 and '6?

7         MR. BEQUETTE:  None of them.

8         MR. WALKER:  I would like to establish that none of

9   the current board members -- we stipulated without testimony

10  that none of the persons in court with Mr. Bequette who are

11  board members were on the board in 2005-6 and that of the

12  present board members, according to what I remember

13  Mr. Bequette saying earlier, the ones who were on the board in

14  2006, there is only one carryover.

15        MR. BEQUETTE:  That's correct.  We can stipulate to

16  that.

17        THE COURT:  All right.  Is this motion -- do you have

18  anything more?

19        MR. RICHARDSON:  I just want to give you a law cite on

20  the Voting Rights Act question.  Arkansas Code Annotated

21  6-13-631 requires a school district with a 10 percent or

22  greater minority population to elect from single member zones.

23  Palestine-Wheatley would be excepted because they are under

24  consent decree, but once they are released from that, they

25  would come under this law.
```

1        THE COURT:  All right.  Anything more?  I think we

2    have stipulated that there are -- the voting rights matter is

3    not part of this case.  There is no indication right now that

4    Palestine-Wheatley is intending to do anything other than

5    single member districts within the Voting Rights Act.  And so

6    that was never -- when Mr. Bequette, on behalf of the district,

7    asked for this decree to be terminated, he was not intending to

8    terminate that part of the consent decree.

9        Is that correct, Mr. Bequette?  You are not trying to back

10   off from that part of the consent decree?

11       MR. BEQUETTE:  No.

12       THE COURT:  Okay.  Anything more?  Is there any reason

13   I shouldn't set a schedule for you-all to brief the issues to

14   the Court once again, in light of the evidence that has been

15   received?

16       MR. BEQUETTE:  That would be fine, Your Honor.

17       THE COURT:  All right.  And I will also direct that

18   since the burden of proof is on the defendant, I am going to

19   ask that you submit yours first and you respond, Mr. Walker,

20   and then I will permit you to reply.

21       MR. BEQUETTE:  Thank you, Your Honor.

22       THE COURT:  And I would -- and you may also -- you are

23   a plaintiff too.

24       MR. RICHARDSON:  I am, but Mr. Walker has made some

25   statements trying to turn this into some sort of interdistrict

1    case against the state.  If that comes up in his response, I

2    would like the opportunity to reply.

3         THE COURT:  You may do that, and we will put the state

4    in to reply for anything Mr. Walker might have.

5         I want you to remember that there is a strong precedent in

6    this state, and I am not trying to say that it's part of this

7    case.  I am not agreeing with Mr. Walker that it's part of this

8    case on the consent decree.  But there is strong precedent in

9    this district concerning interdistrict race discrimination, and

10   it's the Little Rock school desegregation case, the three

11   districts, because in that case, the district court found and

12   the Eighth Circuit affirmed that the state and Pulaski County

13   and North Little Rock had all been complicit in -- well,

14   Mr. Walker, you were the lawyer, one of the lawyers -- in

15   discriminating against the black students in central Arkansas.

16   And from that -- and it's still going on.  The case is still

17   going on.  I haven't been in it in ten years, but --

18        Yes, Mr. Richardson?

19        MR. RICHARDSON:  For the Court's information, state

20   has moved for release from Court jurisdiction in that case, and

21   I am the lawyer for the state in that case.

22        THE COURT:  Well, I dismissed the state back in 1990.

23        MR. WALKER:  '89 -- '98?

24        THE COURT:  I wasn't a judge until 1990.  And I

25   dismissed the state in 1990 in accordance with the consent

1    decree that Judge Woods had refused to accept and the Eighth

2    Circuit had told him he must accept.  And so I dismissed the

3    state as a party, but it has been very much part of the case

4    because it has to pay a lot of money.

5        What else can you say?

6            MR. RICHARDSON:  I don't know.

7            THE COURT:  But so all I am suggesting is I will -- I

8    mean, Mr. Walker can write what he wants and try to convince me

9    that what other -- that these interdistrict transfers are

10   somehow part of this case.  That's not the way it has been pled

11   by the defendant, but he can try to, you know, to convince me

12   otherwise and make his record on it.

13       When, Mr. Bequette, would be a good time for you to submit

14   your brief to me, your post-hearing brief?

15           MR. BEQUETTE:  I would say two weeks from today.

16           THE COURT:  Two weeks from today.  That will be fine.

17   Today is the 20th.  Two weeks from today is October, what, 4th?

18       All right.  And then the rules will give you, I believe,

19   what, two weeks to file a response and then a week to file --

20           MR. WALKER:  Your Honor --

21           THE COURT:  The rules don't say anything.

22           MR. WALKER:  I have a long trial scheduled in another

23   school case, the Brinkley school case -- district.  That is how

24   I know about this -- that is during that time or at least the

25   preparation for finishing is during that time.  May I have

1  until after the election?  That's only 30 days.

2      THE COURT:  Well, I will stretch out what Mr. Bequette

3  needs to do then.  You want until after the election.  That is

4  November 6th?

5      MR. WALKER:  November 6th or 7th.  So two days after

6  then would be fine.

7      THE COURT:  Your date would be November 8th.

8      MR. WALKER:  Thank you.

9      THE COURT:  And I will -- how much time do you think

10  you need after Mr. Bequette submits his?

11      MR. WALKER:  Oh, I don't know, Your Honor, because I

12  am going to be fully in court almost all the time in

13  preparation for the Brinkley matter, two matters involving

14  Brinkley and some others.  I don't need to reply.  If I had

15  November 8th, that would be fine.

16      THE COURT:  Well, but I just want to know when I

17  should ask Mr. Bequette to have his submission in.  He has

18  offered in two weeks, but I think I will give him a little

19  longer now.

20      MR. WALKER:  How about October 8th?

21      THE COURT:  Okay.  That's fine.  October 8th is a

22  Monday.  Monday, October 8th for the defendants to submit their

23  post-hearing brief.  Then November 8th for the plaintiffs to

24  submit theirs, and then I will say November 22nd, that's around

25  Thanksgiving, isn't it?  Oh, October 8 is a holiday.

Cheryl Nelson Kellar, RPR, CRR, CCR
United States Court Reporter

1     October 9.  Yeah.  We're going to be in Jonesboro, okay.

2     October 9, Mr. Bequette, because the 8th is a holiday.  It

3  probably won't be for you, but the courts won't be open.  And

4  then I will make it -- when is Thanksgiving?

5          MR. BEQUETTE:  Thanksgiving is the 22nd.

6          THE COURT:  How about the 26th for the reply, and also

7  for your reply, Mr. Richardson.  Is that all right?

8          MR. RICHARDSON:  Yes, ma'am.

9          MR. BEQUETTE:  Yes, Your Honor.

10         THE COURT:  And then maybe I can get it decided by the

11  early part of 2013 so you can try to deal with it.  Am I

12  pushing this too far back?

13         MR. BEQUETTE:  No, Your Honor.  We will try to get our

14  reply in soon so the Court's decision process can get started.

15         THE COURT:  I want to get it decided before the fall

16  so you-all can make plans.  These things just drag on and on.

17  The Court of Appeals can take a long time too.

18         MR. BEQUETTE:  We appreciate the Court getting us on

19  the schedule so quickly.

20         THE COURT:  All right.  Well, I appreciate you-all

21  being here, and I will -- we have agreed on the briefing

22  schedule, and I will ask Lucille to put it in an order.  And I

23  will see you-all later maybe, but maybe not in this case.

24     Okay.  Court is in recess.  Thank you.

25     (Proceedings adjourned at 3:15 p.m.)

1                    C E R T I F I C A T E

2        I, Cheryl Nelson Kellar, Official Court Reporter, do

3    hereby certify that the foregoing is a true and correct

4    transcript of proceedings in the above-entitled case.

5

6    /s/ Cheryl N. Kellar, RPR, CRR, CCR   Date:   September 29, 2012
         United States Court Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25